# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-70009

United States Court of Appeals
Fifth Circuit

**FILED**
January 10, 2014

Lyle W. Cayce
Clerk

RODNEY REED,

Petitioner-Appellant

v.

WILLIAM STEPHENS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent-Appellee

Appeal from the United States District Court
for the Western District of Texas

Before KING, CLEMENT, and HIGGINSON, Circuit Judges.

KING, Circuit Judge:

Petitioner-Appellant Rodney Reed was convicted of capital murder in a jury trial in Texas and sentenced to death. The Texas Court of Criminal Appeals affirmed his conviction and sentence on direct appeal. Reed unsuccessfully sought state habeas relief in six petitions. He also sought federal habeas relief in district court and now seeks a certificate of appealability to challenge the district court's denial of habeas relief. Reed argues that he should be granted a certificate of appealability based on his assertions of actual innocence, ineffective assistance of trial, appellate, and habeas counsel, *Brady* violations, and violations of his Sixth, Eighth, and Fourteenth Amendment rights. We hold that reasonable jurists could not

No. 13-70009

debate the district court's conclusions and accordingly DENY Reed's request for a certificate of appealability.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The lengthy history of Petitioner-Appellant Rodney Reed's conviction for the murder of Stacey Lee Stites has been aptly recounted by numerous courts, most comprehensively by the Texas Court of Criminal Appeals ("CCA") in Reed's 2008 post-conviction proceeding. *Ex parte Reed*, 271 S.W.3d 698 (Tex. Crim. App. 2008). We rely on the CCA's factual recitation, and limit our discussion to those facts most pertinent to Reed's present application for a certificate of appealability ("COA").

A.     Stacey Stites's Murder

Stites moved, along with her mother, to Bastrop, Texas in 1995 after graduating from high school, and began working at the Bastrop H.E.B. grocery store. By late December 1995, she was engaged to Jimmy Fennell, a recent police academy graduate. The following month, Stites moved to Giddings, Texas to be closer to her fiancé, who had been hired as a patrol officer with the Giddings Police Department.

Stites continued working at H.E.B., but eventually transferred to the store's produce department to earn more money in preparation for her wedding, scheduled for May 11, 1996. Stites was required to report to work daily at 3:30 a.m. to stock produce. Around 6:30 a.m. on April 23, 1996, one of Stites's coworkers called Stites's mother to inform her that Stites had failed to report to work. Stites's mother called Fennell who set out looking for Stites, while Stites's mother called the police to report her daughter missing.

Earlier that morning, at 5:23 a.m., a police officer with the Bastrop Sheriff's Department had observed Fennell's pickup truck (which Stites routinely drove to work) parked in the Bastrop High School parking lot. After confirming that the vehicle was not reported stolen, there was no broken glass,

2

No. 13-70009

and the driver's side door was locked, the officer returned to his patrol duties. Later, after Stites was reported missing, Officer Ed Selmala, an investigator with the Bastrop Police Department, conducted an investigation of the vehicle.

Stites's body was discovered shortly before 3:00 p.m. later that day in a ditch on the side of a road. Investigators observed that Stites was partially unclothed. She was missing a shoe. Although she wore a bra, she was otherwise shirtless. Her H.E.B. nametag was found in the crook of her leg. Additionally, Stites's pants were undone, her pants' zipper was broken, and her underwear was bunched around her hips. A piece of webbed belt belonging to Stites was located at the edge of the road, and matched a piece of belt discovered outside Fennell's truck. Two beer cans lying across the road from Stites's body were also collected.

Karen Blakely, a criminalist and serologist with the Texas Department of Public Safety, took vaginal and breast swabs from Stites's body, which showed the presence of semen. However, as a result of rigor mortis, Blakely could not determine whether Stites had been anally sodomized. Blakely observed various other injuries to Stites's body, including an indentation in her neck, apparently caused by the piece of belt found nearby, scratches on her abdomen and arms, a cigarette burn on one arm, and shallow wounds on her wrists and back that appeared to have been caused by fire-ants.

An autopsy the following day by medical examiner Dr. Roberto Bayardo revealed bruises on Stites's arms, bruises on her head in a pattern consistent with the knuckles of a fist, and bruises on her left shoulder and abdomen consistent with a seatbelt. A wide mark across her neck matched the pattern of her belt. Dr. Bayardo concluded that the belt was the murder weapon, and that Stites was strangled to death. He estimated her time of death as approximately 3:00 a.m.

3

No. 13-70009

Dr. Bayardo also took vaginal swabs and identified intact sperm, indicating that the sperm had entered Stites's vagina "quite recently." Dr. Bayardo also observed injuries to her anus, including dilation and superficial lacerations consistent with penile penetration inflicted at or near the time of Stites's death. Rectal swabs showed sperm heads without visible tails leading Dr. Bayardo to report a "negative" result. Dr. Bayardo also could not rule out the possibility that the presence of sperm in the anus was the result of seepage from the vagina. Further DNA testing on Stites's blood, the vaginal swabs, and liquid in Stites's underwear showed that there was a single semen donor.

Authorities thereafter engaged in an eleven-month-long investigation. Police interviewed hundreds of individuals and identified over twenty-eight male suspects, including Fennell (Stites's fiancé), Officer David Hall (one of Fennell's fellow officers), and David Lawhon (a man who, officials learned, was bragging about killing Stites and who had killed another woman, Mary Ann Arldt, a few weeks after Stites's murder). None of the suspects' DNA matched that recovered from Stites's body.

Eventually, Reed was identified as a suspect. Bastrop police officers frequently saw Reed in the early morning hours near Stites's usual work route and the parking lot where Fennell's pickup was found. A comparison between Reed's DNA and that found on Stites's body revealed that Reed could not be excluded as a suspect. Additional DNA analysis proved that Reed's genetic profile matched that of the semen found at the crime scene.

B.     Reed's Trial

Reed was charged with capital murder in May 1997. At trial, state prosecutors presented evidence of the murder investigation, as well as testimony by Dr. Bayardo, Blakely, and DNA analyst Meghan Clement. Reed's trial defense consisted of two parts: First, Reed attempted to show that Fennell, Lawhon, or someone else could have committed the offense; and

4

## No. 13-70009

second, Reed tried to explain why his semen was in Stites's body by evidencing a romantic relationship between himself and Stites.  In furtherance of this trial strategy, Reed's defense team called multiple witnesses, including a DNA expert, Dr. Elizabeth Ann Johnson.  A jury ultimately rejected Reed's defense and found him guilty.

During the trial's punishment phase, state prosecutors introduced evidence that Reed had committed numerous other sexual assaults.  The jury, after weighing the evidence, answered the special issues submitted pursuant to Texas Code of Criminal Procedure Article 37.071, and sentenced Reed to death.[1]

C.    State Post-Conviction Proceedings

On direct appeal, the CCA affirmed Reed's conviction and sentence. While his direct appeal was pending, Reed filed the first of six state habeas applications.  Based on the state trial court's recommended findings of fact and

---

[1] Article 37.071 § 2 provides that on conclusion of the presentation of the evidence in a capital murder case, the court shall submit the following issues to the jury:

(1) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and
(2) in cases in which the jury charge at the guilt or innocence stage permitted the jury to find the defendant guilty as a party under Sections 7.01 and 7.02, Penal Code, whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken.

Tex. Code Crim. Proc. Ann. art. 37.071 § 2(b).

If the answers to these questions are in the affirmative, the court will submit the following issue:

[(3)] [w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.

Id. § 2(e)(1).

No. 13-70009

conclusions of law, and the CCA's own review of the record, the CCA denied Reed's petition on February 13, 2002.

Before the CCA ruled on Reed's state habeas petition, Reed filed a supplemental habeas claim, which the CCA interpreted as a subsequent application. In his second application, Reed argued that the State failed to turn over a letter containing DNA results from the beer cans found near the crime scene in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The CCA dismissed Reed's subsequent habeas petition as an abuse of the writ for not meeting any of the exceptions listed in Article 11.071 of the Texas Code of Criminal Procedure.[2]

In March 2005, Reed filed his third state habeas petition, again arguing that the State suppressed evidence in violation of *Brady*. Reed also added other claims, including a freestanding actual innocence claim, ineffective assistance of trial and appellate counsel claims, and a claim that Texas's capital sentencing statute unconstitutionally prohibits jury instructions on the

---

[2] Article 11.071 § 5(a) provides in relevant part that:

If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:

> (1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application . . . because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;
> (2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or
> (3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury . . . .

Tex. Code Crim. Proc. Ann. art. 11.071 § 5(a).

effect of a juror's "no" vote. The CCA directed the trial court to hold a hearing as to some of the allegedly suppressed evidence, and dismissed the remaining claims as abuses of the writ. After conducting an evidentiary hearing, the trial judge recommended that Reed's third state habeas petition be denied. The CCA ordered supplemental briefing and held oral argument. It then issued a lengthy, detailed opinion holding that the record did not support Reed's *Brady* claims, and further that Reed had failed to make a prima facie showing of innocence by a preponderance of the evidence, foreclosing review of the other claims raised in his third state habeas petition.

Reed filed a fourth habeas petition in February 2007, again raising *Brady* claims. A fifth state habeas petition followed in July 2008, raising still more *Brady* claims. On January 14, 2009, the CCA rejected the claims raised in Reed's fourth and fifth petitions as abuses of the writ. Reed filed a sixth state habeas petition on April 21, 2009, but this too was dismissed by the CCA as an abuse of the writ.

D.     Federal Post-Conviction Proceedings

Following the CCA's denial of Reed's second state habeas petition, Reed sought federal habeas relief under 28 U.S.C. § 2254. The district court allowed limited discovery and depositions, and determined that Reed had failed to exhaust in state court several of his claims arising out of evidence that was not discovered until after the federal writ was filed. The district court entered a stay of the federal writ in March 2004 to allow Reed to pursue his claims in state court.

On August 5, 2009, after the last of Reed's state habeas petitions was denied, Reed moved the district court to lift its stay. Reed filed a corrected second amended petition on February 12, 2010, and the State moved for summary judgment. The district court referred Reed's petition to a magistrate judge who issued a comprehensive report and recommendation exhaustively

No. 13-70009

listing each of Reed's claims, and recommending that federal habeas relief be denied.

On September 26, 2012, after reviewing objections by both parties, the district court issued a lengthy order largely adopting the magistrate judge's report and recommendation, denying habeas relief, and denying a COA. Reed subsequently filed a motion to alter or amend judgment on October 23, and a motion for leave to amend his petition and abate proceedings on November 30. In these two motions, Reed asked the district court to reopen his case, vacate its prior judgment, grant him leave to add an additional due process claim, and abate all further proceedings until he exhausted the due process claim in state court. The district court denied Reed's motions on February 4, 2013.

Reed timely filed his application for a COA to appeal the district court's decision on March 1, 2013.

## II. STANDARD OF REVIEW

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), §§ 101–108, Pub. L. No. 104-132, 110 Stat. 1214 (codified as amended at 28 U.S.C. §§ 2244, 2253–2266), a state habeas petitioner may appeal a district court's dismissal of his petition only if he first obtains a COA from the district court or the court of appeals. 28 U.S.C. § 2253(c)(1)(A). To obtain a COA, the petitioner must make "a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). By contrast:

> When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition

8

states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Id.*

In reviewing Reed's request for a COA, we only conduct a threshold inquiry into the merits of the claims Reed raised in his underlying habeas petition. *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statute forbids it." *Id.* In death penalty cases, "any doubts as to whether a COA should issue must be resolved in [the petitioner's] favor." *Ramirez v. Dretke*, 398 F.3d 691, 694 (5th Cir. 2005) (alteration in original) (internal quotation marks and citation omitted).

AEDPA provides that a district court may not grant habeas relief with respect to any claim that was adjudicated on the merits in the state court proceedings, unless the state habeas court's denial:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"A state court's decision is contrary to Supreme Court precedent if: (1) 'the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law'; or (2) 'the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [that of the Supreme Court].'" *Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir. 2005) (alterations in original) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)), *cert. denied*, 549 U.S. 828 (2006). "A state court's decision is an unreasonable application of clearly established federal

No. 13-70009

law whenever the state court identifies the correct governing legal principle from the Supreme Court's decisions but applies that principle to the facts of the prisoner's case in an objectively unreasonable manner." *Id.* (quoting *Young v. Dretke*, 356 F.3d 616, 623 (5th Cir. 2004)). "An unreasonable application may also occur if 'the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" *Id.* at 787–88 (alteration in original) (quoting *Young*, 356 F.3d at 623). In evaluating the evidence presented in state court, we presume the state court's factual findings correct unless a petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## III. DISCUSSION

Reed broadly can be understood as seeking a COA on his claims that (1) he was actually innocent of Stites's murder; (2) he received ineffective assistance of trial counsel; (3) he received ineffective assistance of appellate counsel; (4) his appellate counsel labored under a conflict-of-interest in violation of the Sixth Amendment; (5) the State suppressed evidence in violation of *Brady*; and (6) his Eighth and Fourteenth Amendment rights were violated when the State presented evidence during the trial's punishment phase of an alleged sexual assault of which he had been acquitted.

The substance of the arguments he presents in support of these claims follows the principle themes of his defense at trial. These were, first, that someone other than him murdered Stites, and, second, that he had a romantic relationship with Stites. As to the first, Reed posited that there were numerous other individuals who could have murdered Stites. These included Fennell, Stites's fiancé; Lawhon, who actually bragged of killing Stites; and Officer Hall, another Giddings police officer. As to the second, Reed attempted

10

to explain the presence of his semen in Stites as the result of a consensual sexual relationship between him and Stites.

Reed presented evidence during trial in support of both theories. A jury considered the evidence, and rejected it, finding Reed guilty of Stites's murder. Throughout his habeas petitions, Reed presented additional evidence to show that one of the other suspects committed the murder, and that he and Stites were dating. The CCA ordered an evidentiary hearing, requested supplemental briefing, and ultimately rejected Reed's arguments. Including the trial jury and, on habeas, the state trial court and the CCA, three fact-finders thus have considered the very theories and much of the evidence Reed pursued in federal court.[3]

Reed's request for a COA is further distinguished based on the DNA evidence in this case. DNA evidence is sometimes claimed to be relevant because it may exculpate the defendant. Here, by contrast, the fact that Reed's sperm was in Stites is undisputed. The need to explain that fact drives Reed's efforts to show that he and Stites were engaged in a clandestine sexual affair.

Against this backdrop, we turn to consider Reed's multiple requests for a COA. As we discuss, the district court denied habeas relief under AEDPA's deferential framework, after largely adopting a magistrate judge's report and recommendation. Our task is to consider whether the district court's conclusions are debatable. We note that although many of Reed's claims were

---

[3] In Texas, "[o]n postconviction review of habeas corpus applications, the convicting court is the 'original factfinder,' and [the CCA] is the ultimate factfinder." *Ex parte Chavez*, 371 S.W.3d 200, 207 (Tex. Crim. App. 2012). Although the CCA will "generally defer to and accept the convicting court's findings of fact and conclusions of law," the CCA may exercise its authority "to make contrary or alternative findings and conclusions" when its "independent review of the record reveals that the trial judge's findings and conclusions are not supported by the record." *Id.* (internal quotation marks and citations omitted); *see also Ex parte Flores*, 387 S.W.3d 626, 634–35 (Tex. Crim. App. 2012) (CCA acts as "the ultimate fact finder" when the lower court's findings "do not resolve the necessary factual issues").

procedurally defaulted, a COA should still issue as to them if Reed can show "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. Because Reed's ability to show constitutional and procedural debatability determines whether he is entitled to have his procedurally defaulted claims reviewed on the merits, we consider first his reasons for overcoming the procedural bar—actual innocence under *Schlup v. Delo*, 513 U.S. 298 (1995), and ineffective assistance of counsel under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). Other than prioritizing our review of his *Schlup* and *Martinez* arguments, we consider Reed's other claims in turn.

A.     Actual Innocence

Reed asks for two separate COAs arising out of his assertion that he is actually innocent of murdering Stites. First, he asks that we grant a COA on his freestanding actual innocence claim. Second, he asks that we grant a COA to review whether he satisfies *Schlup*'s actual innocence standard, which would permit a federal court to review the merits of his otherwise procedurally defaulted claims. Of his two actual innocence arguments, the first is easily resolved.

Reed raised his freestanding actual innocence claim in his third state habeas petition. The CCA dismissed the claim pursuant to its abuse-of-the-writ doctrine. Under that doctrine, the CCA will not consider an argument not raised in an initial state habeas petition unless one of a narrow set of exceptions applies. *See* Tex. Code Crim. Proc. Ann. art. 11.071 § 5(a). We previously have held that "since 1994, the Texas abuse of the writ doctrine has been consistently applied as a procedural bar, and that it is an independent and adequate state ground for the purpose of imposing a procedural bar."

*Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008).[4]  The district court does not appear to have considered whether this claim was procedurally barred, rejecting it instead on the ground that this circuit does not recognize freestanding actual innocence claims.

Reed concedes that our precedent precludes his freestanding actual innocence claim.  *See In re Swearingen*, 556 F.3d 344, 348 (5th Cir. 2009); *see also Foster v. Quarterman*, 466 F.3d 359, 367 (5th Cir. 2006) ("[A]ctual-innocence is *not* an independently cognizable federal-habeas claim."); *see, e.g.*, *Matheson v. United States*, 440 F. App'x 420, 421 (5th Cir. 2011).  Reasonable jurists thus would not debate the district court's denial of habeas relief on this claim, and we similarly deny a COA.

Reed's other actual innocence argument requires more detailed consideration.  Reed argues that reasonable jurists would debate the district court's decision not to consider his procedurally defaulted claims because he has shown that he is actually innocent of Stites's murder under *Schlup*, 513 U.S. 298.  As he did at trial, Reed argues that he did not sexually assault and murder Stites, but rather that he was in a relationship with her, and that the semen present in her vagina was the result of consensual sexual intercourse.  Reed attempted to establish such a relationship through testimony that he and Stites were seen together.  He now argues his consensual relationship with Stites is demonstrated by forensic evidence showing that his sperm entered Stites's body more than twenty-four hours before the murder.  This is significant, Reed claims, because Stites's failure to report non-consensual sex to law enforcement indicates that the encounter was the product of their romantic relationship.  In support of the part of this theory relating to the age

---

[4] We deny Reed a COA as to his assertion that Texas's abuse-of-the-writ doctrine is not an independent and adequate state procedural bar.  *See Hughes*, 530 F.3d at 342.

of the sperm found in Stites, he primarily relies on affidavits by Dr. Bayardo and Dr. Leroy Riddick.

A district court must deny federal habeas relief on procedurally defaulted claims dismissed "pursuant to an independent and adequate state procedural rule," such as Texas's abuse-of-the-writ doctrine. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see Maples v. Thomas*, 132 S. Ct. 912, 922 (2012); *Finley v. Johnson*, 243 F.3d 215, 218 (5th Cir. 2001). *Schlup* held that, in "rare" and "extraordinary case[s]," a federal habeas petitioner may overcome a procedural default in state court by demonstrating a "fundamental miscarriage of justice." 513 U.S. at 321. A petitioner makes such a showing where he establishes that he is "actually innocent" of the offense for which he was convicted. *Williams v. Thaler*, 602 F.3d 291, 307 (5th Cir. 2010) (citing *Schlup*, 513 U.S. at 326–27). To do so, a petitioner must "establish through new and reliable evidence that it was more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Woodfox v. Cain*, 609 F.3d 774, 794 (5th Cir. 2010) (internal quotation marks and citation omitted). This evidence may include "exculpatory scientific evidence, credible declarations of guilt by another, trustworthy eyewitness accounts, and certain physical evidence." *Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999). But "the habeas court's analysis is not limited to such evidence." *House v. Bell*, 547 U.S. 518, 537 (2006). Rather, "the habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *Id.* at 538 (internal quotation marks and citation omitted).

"Based on this total record, the court must make 'a probabilistic determination about what reasonable, properly instructed jurors would do.'" *Id.* (quoting *Schlup*, 513 U.S. at 329). The actual-innocence standard "does not

merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty." *Schlup*, 513 U.S. at 329. Put differently, "a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.*

We observe that this is not the first time Reed has argued actual innocence. Reed raised the same argument before the CCA. The CCA considered his argument under Article 11.071 § 5(a)(2), which provides that the CCA will consider an argument not raised in an initial state habeas petition if "by a preponderance of the evidence, but for a violation of the United States Constitution[,] no rational juror could have found the applicant guilty beyond a reasonable doubt." *See Reed*, 271 S.W.3d at 733–34, 746–47. Because Article 11.071 § 5(a)(2) was enacted in response to *Schlup*, the CCA concluded that the "standards set forth for evaluating a gateway-actual-innocence claim announced by the Supreme Court should guide our consideration of such claims under Section 5(a)(2)." *Id.* at 733.

The CCA proceeded to engage in a voluminous discussion of all the evidence, "old and new," before concluding that "Reed [had] not made a threshold, prima facie showing of innocence by a preponderance of the evidence." *Id.* at 751. The CCA considered—and dismissed as insufficient— evidence that: DNA test results from the beer cans found at the crime scene showed that Officer Hall was a potential suspect; Fennell and the Giddings Police Department had a reputation for violence; Reed and Stites had a consensual sexual relationship prior to her death; and unidentified men were seen in Stites's company the morning of the murder. *Id.* at 746–51. It rejected as unreliable and not credible a host of additional evidence, including from the many witnesses Reed contends knew of his purported relationship with Stites.

*Id.* at 747. Because Reed had not shown that he was actually innocent of Stites's murder, the CCA "refuse[d] to consider the merits of Reed's other constitutional claims." *Id.*

The magistrate judge deferred to the CCA's findings of fact after adopting the Fourth Circuit's reasoning in *Sharpe v. Bell*, 593 F.3d 372, 379 (4th Cir. 2010), that "[w]here a state court looks at the same body of relevant evidence and applies essentially the same legal standard to that evidence that the federal court does under *Schlup*, [§] 2254(e)(1) requires that the state court's findings of fact not be casually set aside." In particular, the magistrate judge remarked that "[a] detailed explanation of why the CCA's decision on actual innocence is worthy of deference from this Court would entail simply repeating what the CCA itself has already stated in great detail." However, the magistrate judge nevertheless reviewed the CCA's analysis, focusing on the alleged consensual relationship between Reed and Stites that would explain the presence of Reed's semen. The magistrate judge concluded that "[e]ven if the Court were not required to defer to the CCA's determinations, the Court would reach the same conclusion the CCA did for the same reasons."

The district court was similarly unpersuaded by Reed's arguments because the evidence Reed submitted only created the possibility that the sperm was deposited at an earlier time. The court found that the lack of evidence of an actual relationship between Stites and Reed, combined with the condition in which Stites's body was found (which strongly indicated a violent sexual assault), defeated Reed's assertion of actual innocence. The district court found that the magistrate judge did not err in adopting the *Sharpe* standard, and rejected Reed's contention that the magistrate judge improperly failed to consider certain evidence. Addressing Dr. Bayardo's affidavit, the district court refused to accept it, finding the "timing and content" of Reed's submission, after the magistrate judge issued his report and recommendation,

"extremely suspect." The court further found, however, that even substantively considered, Dr. Bayardo's affidavit would have "little probative value."[5] As to Dr. Riddick's affidavit, the district court found that the "evidence strongly suggest[ed] that Stites was sexually assaulted," and that evidence like Dr. Riddick's affidavit "would not exculpate Reed absent evidence that Reed and Stites were involved in a consensual sexual relationship."

We conclude that the district court did not err in its analysis under AEDPA, and that its conclusion is not debatable by reasonable jurists. Reed primarily faults the district court for not giving sufficient weight to the affidavits of Dr. Bayardo and Dr. Riddick, which he argues show "that Stites and Reed *likely* had intercourse more than 24 hours before Stites's murder." In Reed's view, "[b]ecause the forensic testimony offered in this habeas proceeding is itself persuasive evidence of a consensual relationship [between Reed and Stites], a COA should issue." We disagree.

---

[5] In its order denying Reed's motion to alter or amend judgment, the district court clarified that it "ha[d] considered Reed's arguments with respect to [Dr. Bayardo's] . . . affidavit, despite Reed's delay in presenting [Dr.] Bayardo's statements." Regardless, we find that even had the district court not considered Dr. Bayardo's affidavit, it would have acted within its discretion because the affidavit was untimely. Reed has provided no persuasive reason for waiting well over a decade to revisit Dr. Bayardo's testimony. Although "the district court need not reject newly-proffered evidence simply because it was not presented to the magistrate judge," it also is true that "[l]itigants may not . . . use the magistrate judge as a mere sounding-board for the sufficiency of the evidence." *Freeman v. Cnty. of Bexar*, 142 F.3d 848, 852 (5th Cir. 1998); *see also Brown v. Roe*, 279 F.3d 742, 744 (9th Cir. 2002). We consider whether the affidavit would alter our conclusion, assuming it properly is before us. In so doing, we do not reach the question of whether evidence like Dr. Bayardo's affidavit is "new" within the meaning of *Schlup*. *See In re Warren*, – F. App'x —, 2013 WL 3870423, at *4 n.2 (5th Cir. July 29, 2013) (Dennis, J., dissenting in part and concurring in part) (citing *Wright v. Quarterman*, 470 F.3d 581 (5th Cir. 2006)) (noting circuit split "as to whether, under *Schlup*, the evidence was not discoverable at the time of trial or whether it is sufficient that the evidence be newly presented," and declining to resolve issue). *But see Moore v. Quarterman*, 534 F.3d 454, 465 (5th Cir. 2008) (describing evidence as not "new" where "it was always within the reach of [petitioner's] personal knowledge or reasonable investigation").

No. 13-70009

Dr. Bayardo testified at trial and estimated that Stites died on April 23, 1996, at approximately 3:00 a.m., give or take a few hours. He further determined that the presence of intact sperm indicated that the sperm entered Stites's body "quite recently." In an affidavit submitted by Reed's counsel after the magistrate judge recommended denying habeas relief, Dr. Bayardo sought to distance himself from the State's interpretation of his trial testimony.

The affidavit clarifies that the estimated time of death was a mere "estimate" and should not have been used as an accurate statement of when Stites died. Dr. Bayardo also questions the qualifications of other State experts who testified that spermatozoa could remain intact in a vagina for no more than twenty-four or twenty-six hours. He adds that "the spermatozoa [he] found in Ms. Stites's vaginal cavity could have been deposited days before her death" and that the few spermatozoa that were found suggested that they were deposited more than twenty-four hours before Stites's death. Dr. Bayardo further opines that, although having testified that Stites "was sexually assaulted," the "presence of spermatozoa in Ms. Stites's vaginal cavity was not evidence of sexual assault." Further, "[t]here was no indication that the spermatozoa in Ms. Stites's vaginal cavity was placed there in any fashion other than consensually." Dr. Bayardo instead believes that Stites was sexually assaulted in her anal cavity, but that the assault "did not result in the deposit of any spermatozoa." Although conceding that the injuries to Stites's anus were consistent with penile penetration, Dr. Bayardo believes the injuries "are more consistent with penetration by a rod-like instrument, such as a police baton," an apparent attempt to implicate Stites's fiancé, Fennell, a former police officer, in the murder.

Like the district court, we conclude that Dr. Bayardo's affidavit contributes little to the evidence already in the record. Dr. Bayardo's affidavit is largely bereft of scientific evidence supporting his belief that Reed's sperm

was deposited in Stites more than twenty-four hours before the murder or that the forensic evidence points more strongly to someone else having committed the sexual assault. In particular, his contention that, despite Stites having been the victim of a sexual assault, there is no indication that the sperm found in her vaginal cavity "was placed there in any fashion other than consensually" is blatantly contradicted by the condition in which Stites's body was found.

Dr. Bayardo's purported "disavowal" of his trial testimony also does not contradict much of his original testimony. The jury was well aware that the time of death proffered at trial was only an "estimate." Asked whether time-of-death determinations were "an exact science," Dr. Bayardo responded at trial "[n]o, it's not a precise scientific way of making a determination of the time of death, we only can make estimates." Other facts and opinions in Dr. Bayardo's affidavit were put before the jury through other witnesses. The jury heard from Reed's DNA expert, Dr. Johnson, that sperm could remain present in a vaginal cavity for more than twenty-four hours after death. Likewise, Dr. Bayardo only states that the "very few" spermatozoa found "suggest[]" that the sperm was deposited in Stites more than a day before the murder.

Dr. Riddick's affidavit likewise offers Reed less support than he believes. Dr. Riddick's affidavit disputes the State experts' testimony that spermatozoa would not be found more than twenty-four hours after a sexual encounter, and Dr. Bayardo's trial testimony that the sperm was introduced into Stites's vagina a day or two before the autopsy exam. Dr. Riddick opines that "it is impossible to conclude with any degree of scientific certainty, or even probability, that Rodney Reed had sexual intercourse with Stacey Stites less than 24 hours before her death, or even less than 48 hours before her death," and, in fact, "it is possible to conclude that Rodney Reed and Stacey Stites had sexual intercourse as long as a week before Ms. Stites's death, and perhaps even more than a week before." In Dr. Riddick's opinion, "it is highly unlikely

that Mr. Reed and Ms. Stites had sexual intercourse within 24 or even 48 hours of Ms. Stites's death" because if they had "there likely would have been a large amount of semen present."

Notably, Dr. Riddick's affidavit says nothing about the condition in which Stites was found.  Furthermore, the significance of Dr. Riddick's affidavit, like Dr. Bayardo's affidavit, is strongly undercut by the fact that the information contained therein only presents the jury with an alternative scenario it could consider, namely that Reed's sperm entered Stites hours or days before her death.  But the jury had evidence in support of such a scenario and evidently chose to reject it.  Dr. Riddick's affidavit merely presents the possibility that Reed could have had sex with Stites earlier.  A reasonable juror would not be swayed by Dr. Riddick's affidavit, and the district court's conclusion to that effect is not debatable.

Our evaluation of both affidavits is unaltered by Reed's reliance on the Supreme Court's *House* decision, which he contends is factually analogous to this case.  In *House*, the defendant was found guilty of murder based in part on the fact that blood consistent with that of the victim was found on his clothes, and semen consistent with that of the defendant was found on the victim's clothing.  547 U.S. at 528–30.  The defendant in *House* was able to meet *Schlup*'s actual innocence standard by proving that the semen actually came from the victim's husband, and that blood from the victim's autopsy had spilled while stored with House's clothing.  *Id.* at 540–48.  Reed argues that, similarly here, "the State's forensic proof purportedly connecting Reed (by his sperm) to Stites's murder has been debunked by Drs. Riddick and Bayardo."

Contrary to Reed's description, Dr. Bayardo's and Dr. Riddick's affidavits have not "debunked" the State's DNA evidence.  Instead, they merely reinforce evidence already in the record.  There is trial testimony that sperm could be discovered up to three weeks after a victim's death, and that in one case sperm

had been discovered sixteen days after death.  The jury also was aware that the intact sperm in Stites were discovered almost thirty-six hours after the estimated time of death.  Consequently, to the extent Reed's new evidence is limited to these affidavits, the district court's rejection of Reed's gateway-innocence argument is not debatable.[6] *See Moore*, 534 F.3d at 465 n.17 (actual innocence showing "requires something more than pointing to '[a] mere possibility of prejudice,' because a speculative claim 'will not satisfy the actual prejudice prong of the cause and prejudice test, *much less demonstrate actual innocence*'" (emphasis in original) (citation omitted)).

Our conclusion is reinforced by the other evidence in this case, which the district court took note of, but which Reed largely ignores.  The affidavits Reed submits create, at best, the possibility that Reed's sperm entered Stites more than a day before her death, leading to the inference that Reed did not sexually assault Stites, who presumably would have reported such a crime.  By contrast, the evidence that Reed forced himself on Stites and subsequently murdered her is extensive.

Apart from the DNA evidence itself, there is the condition of Stites's body.  Stites was found shirtless.  Her pants were undone, the zipper broken, and her underwear bunched around her hips.  There were fresh bruises along her arms, and marks that appeared to be fingernails dug into flesh.  There were bruises on her head in a pattern consistent with the knuckles of a fist, bruises on her left shoulder and abdomen consistent with a seatbelt, and a wide

---

[6] In his Rule 59(e) motion to alter or amend judgment, Reed also attached the affidavit of Dr. Joseph Warren.  That affidavit, like Dr. Bayardo's and Dr. Riddick's, contends that "intact sperm can be found inside a human woman more than 24 hours after intercourse."  In Dr. Warren's experience, "a period of twenty-four to seventy-two hours post coitus, is a good rule of thumb for how long a forensic biologist can expect to identify intact sperm after intercourse."  Assuming Dr. Warren's affidavit is properly before us, we find the district court's conclusion that Dr. Warren's affidavit does not invalidate the State's theory of guilt because it "merely establishes the possibility of earlier sexual intercourse" not debatable.

mark across her neck matching the pattern of her belt. All this strongly supports the conclusion that Stites was the victim of a sexual assault and that the sperm inside her did not result from a consensual encounter.

Along with this evidence, Reed was known to frequent the route along which Stites drove to work. He also was known to do so almost every night between 9:00 p.m. and 3:00 or 4:00 a.m.—overlapping with the hours Stites would be driving to work.

Furthermore, there was no credible evidence that Reed was in a relationship with Stites.[7] Reed himself denied knowing Stites when police first approached him about her murder. To be sure, many witnesses, at trial and in the course of Reed's state habeas proceedings, testified or submitted evidence that Reed had some kind of a relationship with Stites. But these witnesses were found, in the words of the CCA, "unreliable." *Reed*, 271 S.W.3d at 747. At oral argument, Reed suggested that the witnesses' statements were rejected because the only theory the trial DNA evidence supported was that Reed's sperm likely entered Stites's body close to when she died. But as the magistrate judge ably summarized, Reed's witnesses were found not credible for a host of reasons independent of the DNA evidence:

> Most of [Reed's] witnesses did not know Stacey Stites, and identified her from memory by viewing her photograph. Those who claimed to have known her were proven to be badly mistaken. All of these witnesses were family, friends, or associates of Reed's. Reed was never able to identify anyone who was a friend, family member, or associate of Stacey Stites who claimed to have been

---

[7] Reed asserts that the district court held him to an unreasonably high standard by requiring him to submit "compelling eyewitness evidence of Stites and Reed's affair." In fact, the district court simply required Reed to evidence the existence of a relationship between himself and Stites. Reed's failure to do so is simply a reflection of the complete lack of credible evidence that such a relationship existed, rather than the product of an improper evidentiary burden.

aware of a relationship between Reed and Stites. In short, there is no reliable evidence that ties Reed to Stites before her murder.

(footnote omitted).

For example, one witness who claimed to know Stites from school stated that he saw Stites and Reed together several times, and that they kissed and called each other "baby." The witness further stated that while the witness was in Bastrop County jail, Reed told him that he did not kill Stites. The CCA found these statements not credible because the evidence at trial showed that the witness could not have known Stites from school because Stites moved to Bastrop only after graduating. The witness's general statements also offered no specific facts to be corroborated and did not comport with other evidence.

Two trial witnesses also were found not reliable by the CCA. Julia Estes testified at trial that she once saw Stites and Reed talking at H.E.B. Estes's testimony was impeached by the fact that Reed and his family frequented Estes's bar. Iris Lindley, a longtime friend of Reed's parents, also testified that Stites came by Reed's home looking for him. But Lindley initially misidentified Stites as "Stephanie," and also admitted to not knowing whether Reed and Stites were dating.

These witnesses are but a short selection of the many individuals who submitted evidence purportedly showing Reed's relationship with Stites. As we have noted, the CCA concluded that the evidence as to all the "witnesses who affirmed a relationship between Reed and [Stites]" was "unreliable." *Reed*, 271 S.W.3d at 747. Reed provides no discussion of the individual witnesses' testimonies. The district court saw no reason not to defer to the CCA's credibility determination, and we see none. *See* 28 U.S.C. § 2254(e)(1).[8] As a

---

[8] Reed urges us not to apply § 2254(e)(1)'s presumption of correctness to the CCA's review of his actual innocence claim under *Schlup*. The only authority he presents in support is the Supreme Court's decision in *House*, 547 U.S. 518. But that decision discussed § 2254(e)(2), not (e)(1), *id.* at 539, and we previously have applied § 2254(e)(1) in the context

result, Reed's forensic evidence exists in a vacuum and only presents a possible factual scenario that is not borne out by any of the other evidence. To the extent Reed relies on other evidence not included in the relevant portion of his brief, we discuss that evidence in the course of addressing the claim under which it arises. We conclude that reasonable jurists would not debate the district court's determination that Reed has failed to establish his actual innocence under *Schlup* and deny a COA on this basis.

B.     Ineffective Assistance of Trial Counsel

Reed argues that his trial counsel was constitutionally deficient for failing to (1) refute the State's forensic evidence; (2) present evidence of Stites's and Reed's alleged relationship; and (3) present evidence of Fennell's bad character.[9] He contends that reasonable jurists would debate the correctness of the district court's decision to deny relief. The State responds that all his ineffective-assistance-of-trial-counsel claims were procedurally barred.

The standard for evaluating whether a counsel's performance was constitutionally adequate is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). "First, the defendant must show that counsel's performance was deficient." *Id.* at 687. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* To show deficient performance, "the defendant must show that counsel's representation fell below an objective

---

of an actual innocence claim, *see In re Wright*, 298 F. App'x 342, 344 (5th Cir. 2008); *cf. Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir. 2003) (applying § 2254(e)(1)'s presumption in the context of a freestanding actual innocence claim). Other courts have done likewise. *See, e.g.*, *Carr v. Warden, Leb. Corr. Inst.*, 401 F. App'x 34, 38–39 (6th Cir. 2010); *Sharpe*, 593 F.3d at 379; *Storey v. Roper*, 603 F.3d 507, 524 (8th Cir. 2010); *Love v. Roberts*, 259 F. App'x 58, 63 (10th Cir. 2007); *Goldblum v. Klem*, 510 F.3d 204, 221 n.13 (3d Cir. 2007); *Johnson v. Hooks*, 138 F. App'x 207, 208 (11th Cir. 2005); *Madrid v. Gregoire*, 187 F.3d 648, 1999 WL 439460, at *2 (9th Cir. 1999) (unpublished table decision).

[9] Reed also argues that his habeas counsel was constitutionally deficient for failing to investigate and present expert forensic evidence in response to the State's forensic proof. This argument appears to relate only to his contention that his ineffective-assistance-of-trial-counsel claims should be considered despite being otherwise procedurally defaulted.

standard of reasonableness." *Id.* at 688. To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

Reed raised his ineffective assistance claims in his third state habeas petition. Because Reed did not raise these claims in his initial petition, and because it concluded that none of the exceptions under Article 11.071 § 5(a)(2) applied, the CCA dismissed Reed's ineffective assistance claims "as an abuse of the writ." *Ex parte Reed*, No. WR-50961-03, 2005 WL 2659440 (Tex. Crim. App. Oct. 19, 2005). As Texas's abuse-of-the-writ doctrine is an "independent and adequate state procedural rule," *Coleman*, 501 U.S. at 750, the district court found Reed's ineffective assistance claims procedurally defaulted and did not consider them on the merits. It did, however, briefly consider whether procedural default as to those claims could be excused following the Supreme Court's *Martinez* decision.[10]

In *Martinez*, the Supreme Court held that a petitioner may establish cause to excuse a procedural default as to an ineffective-assistance-of-trial-counsel claim by showing that (1) his state habeas counsel was constitutionally deficient in failing to include the claim in his first state habeas application; and (2) the underlying ineffective-assistance-of-trial-counsel claim is "substantial." 132 S. Ct. at 1318; *see Preyor v. Stephens*, – F. App'x —, 2013

---

[10] The district court also considered whether procedurally defaulted claims like Reed's ineffective-assistance-of-trial-counsel claims could be considered because Reed had demonstrated that he was actually innocent. As discussed *supra*, this argument also fails.

WL 3830160, at *8 (5th Cir. July 25, 2013); *Sells v. Stephens*, – F. App'x —, 2013 WL 3784348, at *8 (5th Cir. July 22, 2013). For a claim to be "substantial," a "prisoner must demonstrate that the claim has some merit." *Martinez*, 132 S. Ct. at 1318. Conversely, an "insubstantial" ineffective assistance claim is one that "does not have any merit" or that is "wholly without factual support." *Id.* at 1319.

The district court concluded that it was not required to review Reed's ineffective assistance claims under *Martinez* in light of our decision in *Ibarra v. Thaler*, 687 F.3d 222, 227 (5th Cir. 2012) (holding that *Martinez* does not apply to Texas court decisions). *Ibarra* has since been overruled by *Trevino v. Thaler*, in which the Supreme Court expanded *Martinez*'s reach because "the Texas procedural system—as a matter of its structure, design, and operation— does not offer most defendants a meaningful opportunity to present a claim of ineffective assistance of trial counsel on direct appeal." 133 S. Ct. 1911, 1921 (2013). Reed's *Martinez* argument thus is no longer foreclosed.

However, although the district court's reliance on *Ibarra* is incorrect following *Trevino*, and thus its procedural ruling is, at the very least, debatable, to obtain a COA Reed must still demonstrate that reasonable jurists would debate "whether the petition states a valid claim of the denial of a constitutional right." *Slack*, 529 U.S. at 478, 484; *see also Womack v. Thaler*, 591 F.3d 757, 758 (5th Cir. 2009); *Blanton v. Quarterman*, 287 F. App'x 407, 408 n.1 (5th Cir. 2008). Concluding that Reed has failed to state any debatable ineffective-assistance-of-counsel claims, we deny a COA. We address each of the purported deficiencies of counsel below.[11]

---

[11] Reed asks that we remand this issue to the district court, citing our decision in *Cantu v. Thaler*, 682 F.3d 1053, 1054 (5th Cir. 2012) (remanding "so that the district court may decide in the first instance the impact of *Martinez*"). But as we explain, Reed has not presented a debatable ineffective assistance claim. *See Amos v. Thornton*, 646 F.3d 199, 203 n.4 (5th Cir. 2011) ("In light of our determination that [petitioner] is not entitled to relief on

No. 13-70009

1.　　Failure to refute State's forensic proof

Reed asserts that his "trial counsel was deficient for not using competent experts to rebut the State's plainly false inference that Stites's death and intercourse with Reed coincided," and contradict the State's anal rape theory. He draws attention to the fact that his trial jury clearly was concerned about the sperm found in Stites's body, as evidenced by the fact that during its deliberations the jury asked questions about the sperm's presence, condition, and durability. Reed relies on affidavits by Dr. Bayardo, Dr. Riddick, and criminal laboratory director Ronald Singer. The State argues that Reed can show neither deficiency nor prejudice as relating to trial counsel's failure to submit evidence of the kind included in the affidavits. This is because his trial counsel actually retained a court-qualified expert in criminalistics and DNA analysis—Dr. Johnson. Moreover, the State contends that any evidence in the affidavits of Dr. Bayardo, Dr. Riddick, and Singer is cumulative, and does not alter the fact that Reed's sperm was found in Stites's body.

The CCA did not consider this claim because it was not raised in Reed's initial state habeas petition. The district court concluded that the claim was procedurally barred and that our *Ibarra* decision foreclosed the possibility of

---

his speedy-trial claim, . . . the district court's error in dismissing that claim as procedurally barred was harmless, and remand is unnecessary."); *cf. Wright v. Quarterman*, 470 F.3d 581, 591 (5th Cir. 2006) (declining to determine whether petitioner established actual innocence where merits of underlying claim were not debatable); *Nelson v. Cockrell*, 77 F. App'x 209, 216 (5th Cir. 2003) (granting COA with respect to ineffective assistance claim, but not remanding case because district court did not err in denying habeas relief because state courts' application of clearly established federal law was not objectively unreasonable), *vacated on other grounds by Nelson v. Dretke*, 542 U.S. 934 (2004). Under these circumstances, we cannot grant a COA. *See Jimenez v. Quarterman*, 555 U.S. 113, 118 n.3 (2009) (COA should issue on district court's denial of habeas relief on procedural grounds only where jurists of reason would debate both the procedural ruling and that petition stated valid claim of denial of a constitutional right). As a practical matter, we also observe that although the district court did not review Reed's ineffective assistance claims under *Martinez*, the district court did review Reed's assertions of actual innocence, which included much of the evidence Reed relies on to show that his counsel acted deficiently.

27

review under *Martinez*.  Although, as discussed, the district court's procedural decision is debatable following *Trevino*, we conclude that Reed's claim that trial counsel was ineffective for not adequately refuting the state's forensic proof is not debatable, and thus does not require issuance of a COA.

Considering the first *Strickland* prong, Reed admits that his DNA expert Dr. Johnson testified at trial that sperm could survive longer than twenty-four hours, and only protests trial counsel's reliance on Dr. Johnson because of her purported lack of credentials and first-hand criminal experience.  Contrary to Reed's apparent belief, his trial counsel's representation does not fall below an "objective standard of reasonableness" merely because the retained expert is not the best or most knowledgeable in her field.  *Strickland*, 466 U.S. at 688.  This is not a case of counsel failing to retain an expert or retaining an expert who could not address the issues disputed at trial.  *See Cox v. Cockrell*, 62 F. App'x 557, 2003 WL 1202920, at *6 (5th Cir. 2003) (unpublished table decision) (counsel not deficient for calling expert who performed poorly, but because expert could not testify as to disputed issue).  Comparing the affidavits Reed presents and the testimony of Dr. Johnson demonstrates that the crux of Reed's argument—that sperm could remain intact for longer than twenty-four hours and that therefore the presence of Reed's sperm could have been the product of a consensual sexual encounter between Reed and Stites—was presented at trial.

Reed's contention that his case is similar to *State v. Fitzpatrick*, 118 So. 3d 737 (Fla. 2013), is unpersuasive.  *Fitzpatrick* was a case in which sperm evidence linked the defendant to the murder victim, and the key question was how long the sperm had been present in the victim.  *Id.* at 748–49.  The Florida Supreme Court affirmed the lower court's decision to grant defendant a new trial based on counsel's deficient performance.  *Id.* at 741.  The court found that "[t]he record repeatedly demonstrates that counsel did not adequately prepare

himself to present an intelligent or knowledgeable defense with respect to the most important issue of [defendant's] trial: the timing of the alleged sexual encounter between [him] and [the victim]." *Id.* at 754. Most glaringly, "counsel failed to retain any forensic or medical experts," and failed to challenge the State's experts or the physical evidence. *Id.* at 754–55.

Unlike trial counsel in *Fitzpatrick*, Reed's defense team scrutinized the DNA evidence and the State's experts. Reed's assertion that a COA should issue because his "trial counsel failed to prepare for, or rebut through cross-examination or contradict by affirmative expert testimony, the State's misleading forensics" ignores that Dr. Johnson testified as a DNA expert for the defense and provided testimony on the very issue Reed now challenges.

It also is not debatable that Reed fails to state a valid constitutional claim based on *Strickland*'s second prong—prejudice. Just as the affidavits do not establish Reed's actual innocence they also do not make it "reasonably likely" that the result of Reed's trial would have been different.[12] *Harrington v. Richter*, 131 S. Ct. 770, 792 (2011) ("[T]he difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" (citation omitted)). The addition of Singer's affidavit to that of Dr. Bayardo's and Dr. Riddick's does nothing to change this outcome.

In his affidavit, Singer challenges the nature of the substance (which appeared to be saliva) found on Stites's brassiere and breasts, and the DNA evidence recovered from that substance. Specifically, Singer states that amylase testing of the type performed on the substance "cannot be relied upon

---

[12] Likewise, we are unmoved by Reed's reliance on an email by Clement agreeing that sperm can remain intact longer than 24 hours, and Blakely's refusal to comment further on this case. This evidence is untimely and does not lend Reed any support beyond that already provided by the affidavits of Dr. Bayardo and Dr. Riddick.

to identify a specific body fluid such as saliva with accuracy." Singer further states that "there is no evidence [that the crime scene examiner] changed gloves between the taking of evidentiary samples," and thus "it is probable that [she] contaminated Ms. Stites' brassiere and breasts with trace evidence. . . . after having probed Ms. Stites' genital area with her fingers and taking swabs and tape lists from Ms. Stites' pubic area."

We note that Singer's affidavit merely recounts deficiencies in how the crime scene was secured and then infers, without further support, that the examiner did not change gloves while inspecting Stites's body. But Singer himself states that "[t]he videotape of the crime scene . . . was poorly done," and "does not completely record the activities at the crime scene." A review of the video also reveals no unbroken sequence in which the examiner collected evidence from Stites's genital area and then touched Stites's chest. Reed also nowhere suggests that the presence of his sperm inside Stites was the result of improper crime scene investigation. Given this, there is nothing to support the contention that the alleged incompetence by police personnel at the crime scene prejudiced Reed.[13]

We conclude that Reed has failed to present a debatable ineffective-assistance-of-trial claim as to his trial counsels' handling of the State's forensic evidence.

---

[13] Reed also argues that effective trial counsel would have used the video recording of the crime scene to show that evidence was contaminated, destroyed, and overlooked. This argument fails for the same reasons detailed above. Further, we reject Reed's suggestion that, but for the police's incompetence, other evidence might have been uncovered. "Such speculation does not show prejudice." *Paz v. Scott*, 68 F.3d 471, 1995 WL 581882, at *2 (5th Cir. 1995) (unpublished table decision).

2.     Trial counsel's failure to present witnesses substantiating Stites's and Reed's alleged relationship

Reed next argues that trial counsel should have presented additional witnesses who could testify as to his relationship with Stites.  In support, he lists the affidavits of multiple witnesses who purportedly knew about the alleged relationship.  In response, the State argues that the decision not to call the various witnesses Reed identifies was "a quintessential strategic decision that cannot be undone through the benefit of hindsight."  It further argues that any prejudice resulting from trial counsel's failure to present these witnesses was speculative.

The CCA did not address the witnesses Reed points to in the context of his ineffective-assistance-of-trial-counsel claim because Reed did not include that claim in his initial habeas petition.  However, as we have noted *supra,* in considering whether Reed's ineffective assistance claim should be considered because he met Article 11.071 § 5(a)(2)'s actual-innocence standard, the CCA concluded that the evidence as to all the "witnesses who affirmed a relationship between Reed and [Stites]" was "unreliable."  *Reed*, 271 S.W.3d at 747.  The district court refused to consider the merits of this claim, finding it procedurally barred.

Although, as discussed, the district court's procedural ruling is debatable, Reed's failure to actually discuss any of the affidavits he identifies, much less show how he was prejudiced by their omission at trial, means that he has failed to state a reasonably debatable claim under *Strickland*.  We further note that, to the extent the CCA also made a credibility determination as to the witnesses Reed identifies, we defer to that factual finding unless Reed presents clear and convincing evidence to the contrary.  *See* 28 U.S.C. § 2254(e)(1).  Having not done so, Reed's request for a COA on this claim is denied.  *See Harrington*, 131 S. Ct. at 792.

3.    Trial counsel's failure to present evidence of Fennell's abuses against women and minorities

In the last of his ineffective-assistance-of-trial-counsel claims, Reed contends that trial counsel was deficient for not conducting a proper pretrial investigation. Such an investigation, Reed asserts, would have revealed that Fennell was a jealous, abusive, and racist individual,[14] against whom civil lawsuits alleging violence and racism had been filed. The State asks that we find this argument waived for inadequate briefing.

The CCA found this claim barred under its abuse-of-the-writ doctrine. The district court denied relief, holding that the claim was procedurally barred. As before, although the procedural part of the district court's ruling is debatable, Reed's failure to adequately brief his claim means that he has failed to state a debatable claim of the denial of a constitutional right.

We agree with the State that Reed has waived his request for a COA. Instead of fully briefing this issue, Reed instead relies on his federal habeas petition to fill in the gaps of his argument. We previously have declined to grant a COA in similar circumstances. *See McGowen v. Thaler*, 675 F.3d 482, 497 (5th Cir. 2012) ("We have held that a COA applicant waives claims by directing the appellate court to briefing before the district court to support his request for a COA. [Petitioner's] reference to his habeas petition therefore does not preserve his claims." (footnote omitted)). As the State correctly argues, waiver is especially appropriate where, as here, the admissibility of much of the evidence Reed refers to is questionable, and Reed provides no defense of its admissibility. *See Clark v. Thaler*, 673 F.3d 410, 429 (5th Cir. 2012) (failure to assert meritless objection is not grounds for deficient performance); *Thompson*

---

[14] Reed is African-American. Fennell is Caucasian, as was Stites.

*v. Thaler*, 432 F. App'x 376, 379 (5th Cir. 2011). His request for a COA on this claim is denied.

C.     Ineffective Assistance of Appellate Counsel

Reed identifies three challenges that his appellate counsel should have raised on direct appeal: (1) a jury instruction that allowed jurors to consider "good conduct time" against the forty years Reed would serve if sentenced to life in prison; (2) the jury not being instructed that a lack of unanimity on special issues during the penalty phase would result in a life sentence; and (3) the denial of a continuance motion to give Reed's trial counsel additional time to prepare.[15] Reed argues that his appellate counsel's failure to raise these issues rendered his appellate counsel's representation constitutionally deficient under *Evitts v. Lucey*, 469 U.S. 387 (1985). The State argues that Reed's ineffective-assistance-of-appellate-counsel claim is waived for inadequate briefing. Alternatively, the State contends that the claim is procedurally defaulted.

Reed detailed his ineffective-assistance-of-appellate-counsel claims in his third state habeas petition. The CCA dismissed these claims as abuses of the writ. The magistrate judge accordingly recommended that the claim be found procedurally defaulted. The district court adopted the magistrate judge's recommendation.

Reed does not appear to challenge the district court's procedural ruling other than through his assertion of actual innocence under *Schlup*, which, as we have discussed, is unavailing. For the same reasons, the district court's denial of habeas relief is not debatable.[16]

---

[15] Reed also argues that appellate counsel was deficient for failing to challenge the exclusion of a witness's statement relating to Lawhon confessing to Stites's murder. This claim is discussed *infra* in connection with Reed's conflict-of-interest claim.

[16] To the extent Reed suggests that his ineffective-assistance-of-appellate-counsel claims also should be considered under *Martinez*, we decline to do so. *See In re Sepulvado*,

No. 13-70009

Even if we looked beyond the district court's non-debatable procedural ruling to inquire into whether Reed has stated a valid claim of the denial of a constitutional right, we would find that Reed's claims would fare no better. Reed's "good conduct time" instruction argument fails because the relevant statutory provision—Article 37.071 § 2(e)(2)(B) (court shall "charge the jury that a defendant sentenced to confinement for life without parole . . . is ineligible for release . . . on parole")—does not appear to have come into effect until after Reed's trial. *See* 1999 Tex. Sess. Law Serv. Ch. 140, § 1 (S.B. 39) (amending Tex. Code Crim. Proc. Ann. art. 37.071). Additionally, Reed's argument fails to show how Reed suffered harm as a result of the jury instruction. *See Ross v. State*, 133 S.W.3d 618, 623 (Tex. Crim. App. 2004) (dispositive issue is "whether the jury was so misled or whether there is a reasonable likelihood that the jury applied the misleading parole charge in a way that prevented it from considering that a life-sentenced appellant would not be eligible for parole for forty years").

Reed's second argument, that the jury should have been informed that a lack of unanimity during the penalty phase would result in a life sentence, is a challenge to Texas's so-called "12-10 Rule."[17] Arguments similar to Reed's

---

707 F.3d 550, 554 & n.8 (5th Cir. 2013); *see also Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013) ("Under *Martinez*'s unambiguous holding our previous understanding of *Coleman* in this regard is still the law—ineffective assistance of post-conviction counsel cannot supply cause for procedural default of a claim of ineffective assistance of appellate counsel."); *Banks v. Workman*, 692 F.3d 1133, 1148 (10th Cir. 2012); *Dansby v. Norris*, 682 F.3d 711, 728–29 (8th Cir. 2012), *vacated sub nom. Dansby v. Hobbs*, 133 S. Ct. 2767 (2013). *But see Ha Van Nguyen v. Curry*, 736 F.3d 1287, 1296 (9th Cir. 2013) (holding that *Martinez* extends to Sixth Amendment ineffective-assistance-of-appellate-counsel claims).

[17] Under Texas law, a life sentence will be imposed if at least ten jurors agree that there is not "a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. Ann. art. 37.071 § 2(b)(1). If the jurors unanimously agree that there is such a probability, they must then determine whether "taking into consideration all of the evidence, including the circumstances

repeatedly have been rejected by this court and Texas courts, most recently in *Parr v. Thaler*, 481 F. App'x 872, 878–79 (5th Cir. 2012). *See, e.g., Druery v. Thaler*, 647 F.3d 535, 542–45 (5th Cir. 2011); *Greer v. Thaler*, 380 F. App'x 373, 389 (5th Cir. 2010); *Gonzales v. State*, 353 S.W.3d 826, 837 (Tex. Crim. App. 2011). Reed presents no grounds to revisit those decisions.

Reed's third argument is equally unavailing. He contends that his appellate counsel should have challenged the trial court's denial of Reed's continuance motion, and more broadly argues that his trial attorneys devoted too little time to preparing his defense. "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case . . . ." *Hall v. Thaler*, 504 F. App'x 269, 283 (5th Cir. 2012) (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)).

The district court adopted the magistrate judge's recommendation to deny relief on this claim. The magistrate judge observed that "although Reed makes general allegations in his pleadings before this Court that having sufficient time is essential to preparing a defense to a capital case, he does not demonstrate with any specificity how his counsel was unprepared to move forward with trial in his case in March 1998." Likewise in his brief to this court, Reed provides little explanation, and we therefore find it waived. *See McGowen*, 675 F.3d at 497. A brief review of the attorney billing records

---

of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed." *Id.* § 2(e)(1). If jurors unanimously agree that there are not such mitigating circumstances, the defendant is sentenced to death. *Id.* § 2(g). If ten jurors agree that there are requisite mitigating circumstances, the defendant is sentenced to life imprisonment. *Id.* In the event jurors cannot agree on answers to either special issue, the court imposes a life sentence. *Id.*

identified by the State also dispels any concerns that Reed's defense team did not spend enough time preparing for trial.

Upon review of Reed's ineffective-assistance-of-appellate-counsel claims, we conclude that even if the district court's finding of procedural default is debatable, Reed's underlying constitutional claims are not.

D.    Appellate Counsel's Conflict of Interest

Reed seeks a COA on his Sixth Amendment claim that his appellate counsel suffered from an actual conflict of interest because, while his appellate counsel represented him on direct appeal, his appellate counsel also represented Lawhon (who boasted of killing Stites) in a separate state habeas proceeding.    Because of that dual-representation, Reed posits that his appellate counsel did not appeal the trial court's exclusion of certain testimony concerning Lawhon's confession.  The State points out that Reed's argument has changed from that which was presented in state court, and that we should not now consider Reed's claim other than how it was presented there.  The State adds that Reed's conflict-of-interest claim lacks merit as evidenced by the fact that Reed can offer no supporting caselaw granting habeas relief in similar circumstances.

Reed raised his conflict-of-interest claim in his first state habeas petition, where he asserted prejudice resulting from the fact that his appellate counsel would not testify about conversations he had with Lawhon that might inculpate Lawhon in Stites's murder.  The CCA rejected this argument.  In district court, Reed argued that his appellate counsel's dual representation had an adverse effect because it resulted in appellate counsel not objecting to the exclusion of certain evidence of Lawhon's alleged confession.  The district court correctly observed that this was not the argument Reed raised in state court, and declined to consider it.

No. 13-70009

We agree with the district court and conclude that reasonable jurists would not disagree with that court's disposal of the claim.  Reed's claim, albeit not procedurally barred on the basis of an independent and adequate state procedural rule, is unexhausted.[18]  *See Kittelson v. Dretke*, 426 F.3d 306, 315–16 (5th Cir. 2005).  Section 2254(b)(1) requires that a petitioner first exhaust his state court remedies before proceeding in federal court.  *See* 28 U.S.C. § 2254(b)(1)(A).  AEDPA's exhaustion requirement is "not satisfied if the petitioner presents new legal theories or factual claims in his federal habeas petition."  *Anderson v. Johnson*, 338 F.3d 382, 386 (5th Cir. 2003).

Even if Reed's conflict-of-interest claim were considered on the merits, it would not be entitled to habeas relief.  *See* 28 U.S.C. § 2254(b)(2) (habeas relief may be denied on the merits, notwithstanding petitioner's failure to exhaust state court remedies); *cf. Miller v. Dretke*, 431 F.3d 241, 245 (5th Cir. 2005) ("Because we hold [petitioner] is *not* entitled to habeas relief on the *Brady*-claim, we need not decide whether the district court erred in considering it."). The jury heard evidence that Lawhon bragged about killing Stites, so any additional testimony to that effect would be cumulative.  Reed's description of the circumstances leading to the witnesses at issue not testifying is also misleading.  It was not the case, as Reed asserts, that "[t]he Trial Court refused to allow [the two witnesses] to testify."  Instead, although they initially expressed their willingness to testify, after consulting with a court-appointed attorney, both witnesses decided to exercise their rights under the Fifth Amendment and not testify.  Reed's suggestion that the trial court acted improperly in ensuring that the witnesses were advised by counsel and fully understood their constitutional rights is baseless.

---

[18] We reject Reed's suggestion that his failure to present this argument should be excused under *Trevino* because of deficient state habeas counsel.  *See Sepulvado*, 707 F.3d at 554–55 & n.8.

E.    *Brady*

Reed seeks a COA with respect to the district court's denial of his *Brady* claims.  Reed contends that the State suppressed: (1) DNA evidence of the beer cans found at the murder scene; (2) witness testimony that Stites and Fennell were arguing the morning of the murder; (3) testimony by a witness who allegedly remembered Fennell threatening to kill Stites with a belt; (4) statements by two witnesses who claimed to have seen Stites driving around with one or two men the morning of the murder; (5) an affidavit by Fennell's former girlfriend; (6) evidence of lawsuits filed against Fennell and the Giddings Police Department; (7) a letter by Fennell to the Giddings city manager; and (8) evidence of criminal corruption by the Bastrop county sheriff.[19]

To establish a *Brady* violation as to any of these claims, Reed had to prove that (1) the prosecution actually suppressed the statements, (2) the statements were favorable to him, and (3) the statements were material.  *See Kyles*, 514 U.S. at 434; *Brady*, 373 U.S. at 87; *see also Trottie v. Stephens*, 720 F.3d 231, 251 (5th Cir. 2013).  A petitioner's *Brady* claim fails if the suppressed evidence was discoverable through reasonable due diligence.  *See United States v. Brown*, 650 F.3d 581, 588 (5th Cir. 2011), *cert. denied*, 132 S. Ct. 1969 (2012). Suppressed evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see United States v. Sipe*, 388 F.3d 471, 485 (5th Cir. 2004).

---

[19] Reed also argues that pursuant to *Kyles v. Whitley*, 514 U.S. 419, 436 (1995), we should collectively review the suppressed evidence together with whatever prejudice Reed suffered as a result of his ineffective assistance of counsel.  We find that none of Reed's *Brady* claims, procedurally barred or otherwise, individually or collectively, are worthy of further consideration under AEDPA's standard as correctly applied by the district court.

No. 13-70009

Although we address Reed's request for a COA as to each of his *Brady* claims below, we note that many of them are procedurally defaulted because Reed has failed to establish actual innocence under *Schlup* and does not separately argue that he has shown cause and prejudice to excuse procedural default as to any particular *Brady* claim.[20]

1.     Beer-can-DNA evidence

Reed contends that the State suppressed a letter containing a DNA report that revealed a mixture of profiles from which Stites, Officer Hall, and Officer Selmala (the officer who investigated Fennell's pickup truck) could not be excluded.  He argues that "[i]t is uncontested that the State's DNA report is exculpatory because it suggests that two officers (one closely associated with Fennell) were with Stites, drinking beer at the crime scene."  The State maintains that this claim is procedurally barred, and that Reed cannot show cause and prejudice to excuse the default.  It further submits that even if the claim were considered on its merits, Reed cannot show prejudice because, at trial, Reed had access to the same DNA evidence and his DNA expert initially reached the same conclusion before conducting more refined Polymarker testing, which excluded Stites and the two police officers.

The CCA dismissed Reed's *Brady* claim as an abuse of the writ.  But although dismissing the claim, the CCA did consider the beer-can-DNA evidence, together with other evidence, in the context of Reed's actual innocence claim.  It found that "[a]lthough this new evidence may indeed arouse a healthy suspicion that Fennell had some involvement in Stacey's death, [the court was] not convinced that Reed ha[d] shown by a preponderance

---

[20] We decline Reed's suggestion that his procedurally defaulted claims may be considered under *Martinez*.  Reed has insufficiently briefed this issue, and we consider this argument waived.  We note that at least one other court has found this argument unpersuasive.  *See Hunton v. Sinclair*, 732 F.3d 1124, 1126–27 (9th Cir. 2013) (rejecting petitioner's attempt to excuse procedurally defaulted *Brady* claim under *Martinez*).

of the evidence that no reasonable juror, confronted with this evidence, would have found him guilty beyond a reasonable doubt."

The magistrate judge, giving Reed the benefit of the doubt, recommended that the district court conclude that Reed had shown cause for the late filing of this *Brady* claim because it was unclear whether his defense team actually had received the State's DNA report. But the magistrate judge also recommended that the district court find that Reed had not made a sufficient showing as to prejudice because Reed's DNA expert, Dr. Johnson, initially reached the same result as the prosecution—that Reed was not a donor, but that Stites, Officer Hall, and Officer Selmala could not be excluded. The district court adopted the magistrate judge's report and recommendation.

Reed does not argue that the district court properly found this claim procedurally defaulted. Instead, he only argues that his claim should be considered because he has satisfied his burden under *Schlup* or *Martinez*, or alternatively, that he has shown cause for not filing this *Brady* claim in his initial habeas petition and resulting prejudice. We already have concluded that a COA should not issue as to Reed's *Schlup* actual innocence claim, *see* our discussion *supra*, and that he has insufficiently briefed his contention that *Martinez* should apply to his *Brady* claims. *See In re Sepulvado*, 707 F.3d at 554 & n.8; *cf. Hunton*, 732 F.3d at 1126–27.

Turning to whether Reed has sufficiently shown cause and default such that the district court's procedural ruling is debatable, we note that, as an initial matter, it is unclear whether the State actually suppressed the report. The attorney responsible for handling the DNA evidence on Reed's defense team simply could not recall whether the DNA report had been received. The fact that four copies of the report were made, only one of which was unaccounted for, suggests that it was. That aside, there are many other problems with this claim.

Most importantly, Reed cannot show that he was prejudiced by the State's DNA report given that Reed's own DNA expert, Dr. Johnson, *reached the same result*—namely, that Reed was not a donor, but that Stites, Officer Hall, and Officer Selmala could not be excluded from the beer-can DNA. *See Holly v. Collins*, 9 F.3d 103, 1993 WL 481732, at \*4 (5th Cir. 1993) (unpublished table decision) ("Awareness of the information purportedly suppressed neutralizes any . . . impropriety for purposes of a *Brady* claim implicating evidence of that information."). Dr. Johnson subsequently conducted Polymarker testing, which excluded all three individuals. The State declined to conduct further DNA testing in light of Dr. Johnson's more refined results.

Reed's *Brady* claim therefore does not arise out of the purported suppression of the State's DNA evidence, but out of his own expert subsequently conducting additional testing that reached a contrary conclusion, which the State then adopted. In an apparent effort to strengthen the State's and Dr. Johnson's original DNA results (which could not exclude Stites, Officer Hall, and Officer Selmala), Reed points to testimony by Dr. Arthur Eisenberg. Dr. Eisenberg opines that the beer can contained DNA from as many as four individuals, one of whom probably was female. Although Stites, Fennell, and Officer Selmala were excluded, Dr. Eisenberg could not exclude Officer Hall as a contributor from the beer-can-DNA evidence. Importantly, Dr. Eisenberg's review of the beer-can-DNA evidence is completely divorced in time from Reed's trial. To prevail under *Brady*, Reed must show that the purported suppression of the State's DNA report *at trial* materially affected the trial's outcome, not that years later another DNA expert would opine that Officer Hall could not be excluded from the DNA mixture. *See Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir. 1994) ("*Brady* claims involve 'the discovery, after

trial of information which had been known to the prosecution but unknown to the defense.'" (citation omitted)).

Reasonable jurists thus would not debate the district court's procedural ruling denying habeas relief on this *Brady* claim.

2.     Martha Barnett's testimony

Reed argues that the district court effectively abdicated its duty under AEDPA to review his claim by failing to credit the testimony of Martha Barnett. In her affidavit, Barnett attests to seeing Stites and a man she later recognized as Fennell together in a loud confrontation between approximately 5:00 and 5:30 a.m. on the day of the murder. Barnett testified that the two were gesturing "like there was some kind of conflict." Reed contends that a review of the relevant evidence shows that Barnett's testimony should not have been discounted. The State counters that Reed has not overcome the state habeas court's credibility determination.

Reed included his *Brady* claim relating to Barnett's testimony in his third state habeas petition. The CCA concluded that Reed's claim satisfied the requirements of Article 11.071 § 5(a), and remanded it to the state trial court for a live evidentiary hearing. The state trial court entered findings of fact and conclusions of law finding Barnett not credible for multiple reasons. These included that Barnett failed to satisfactorily explain why she did not report her sighting until over a year and a half after the murder; the disclosure occurred shortly after Fennell arrested her for driving under the influence; and Barnett claimed to have recognized Fennell from a newspaper article, despite the fact that no newspaper carried such a photograph. The trial court also found Barnett not credible because she changed the time she reported seeing Stites and Fennell from between 5:00 to 5:30 a.m. in her affidavit to approximately 4:45 a.m. during the evidentiary hearing. Additionally, Barnett's alleged sighting did not comport with Stites's usual schedule of reporting for work by

3:30 a.m., nor the fact that Stites evidently was on her way to work when she was murdered. Fennell's truck, which Stites drove to work, also was found at 5:23 a.m., by which time Stites had already been killed. Lastly, Stites's mother woke Fennell at 6:45 a.m.

The CCA similarly found Barnett's testimony unreliable. Although finding parts of the trial court's findings inconsistent with the record and "somewhat misleading," it concluded that they were "largely supported by the record." It determined that Reed had failed to show that the State was in possession of the information regarding Barnett prior to or during trial. Central to this determination was the chain of events by which Barnett first informed her attorney, Steven Keng, about seeing Stites and Fennell, and by which Keng then informed the Bastrop district attorney. After reviewing all the evidence of who told what when, the CCA upheld the state trial court's credibility finding that Keng did not inform the Bastrop district attorney until after Reed's trial. Discussing whether Reed had met his burden of showing actual innocence, the CCA also found the information provided by Barnett "unreliable" and "not credible."

The district court adopted the magistrate judge's recommendation that there was "nothing inconsistent with established federal law in the CCA's reasoning," and that Reed also had not "succeeded in demonstrating by clear and convincing evidence that any of the trial court's or CCA's findings of fact were unreasonable in light of the record before them."

The district court appropriately deferred to the state habeas court's credibility determination under 28 U.S.C. § 2254(e)(1). Reed attempts to overcome § 2254(e)(1)'s presumption of correctness by again arguing that Barnett disclosed her statements to Keng, who then passed them on to the Bastrop district attorney. It was the Bastrop district attorney, Reed alleges, who failed to disclose the statements to the defense team. According to Reed,

the Bastrop district attorney "had professional and financial motives to deny his misconduct," because "a prosecutor's failure to disclose exculpatory evidence can lead to professional discipline or even criminal liability," and "[a]t the time of the habeas hearing, [the district attorney] had a pending lawsuit against [a newspaper] for defamation arising from the paper's coverage of the Reed case."  Assuming Reed is correct and the State suppressed Barnett's statement, Reed still cannot show prejudice because the CCA's determination that Barnett was not a credible witness is supported by unrebutted evidence. Reed points out that Fennell was not called by the state trial court to dispute Barnett's testimony, and that the only motive Barnett had for implicating Fennell was his arrest of her for driving while intoxicated.  But Reed's arguments implicate exactly the type of credibility determination we, as a federal court, leave to the state court that was on-hand to observe the witnesses at issue.  The district court's conclusion that the CCA's decision was not based on an unreasonable determination of the facts thus is not debatable, nor is its determination that Reed has failed to present clear and convincing evidence that the CCA's credibility determination was erroneous.

3.     Mary Blackwell's testimony

Reed claims that the State suppressed a statement by Mary Blackwell. Blackwell's affidavit states that in 1995, during a police academy training class, she overheard Fennell say to another attendee that if he ever discovered Stites (his then-girlfriend) cheating on him he would strangle her.  Blackwell states that she then told Fennell that he would be caught because he would leave fingerprints, to which Fennell responded that he would use a belt. Blackwell also recalled Fennell yelling at Stites.  The State responds that the prosecution indisputably did not learn of Blackwell's statement, if at all, until after Reed's trial, and thus *Brady* should not apply.  Additionally, the State points out that Reed's defense team had as much access to the evidence as the

prosecution because one of Reed's state habeas investigators was told about Blackwell's statement.  Finally, the State asks that the panel defer to the CCA's determination that Blackwell's statement was unreliable and not credible.

Reed included his claim that the State suppressed Blackwell's statement in his third state habeas petition.  As with Reed's *Brady* claim relating to Barnett's testimony, the CCA remanded this claim to the state trial court to conduct a live evidentiary hearing.  The state trial court found Blackwell not credible.  The trial court based its determination on the fact that other testimony showed Fennell was emotionally upset after Stites's death; the attendee to whom Fennell allegedly made the remarks had no recollection of them, and no other attendee heard the alleged statements; Blackwell failed to report information relevant to the homicide investigation despite being a peace officer; Blackwell originally described Fennell as joking; and Blackwell claimed to be entirely unaware of the circumstances of Stites's death despite attending Stites's funeral, living in the area, and knowing Fennell.  The CCA adopted the trial court's findings.  It specifically held that "although we question whether Fennell's statement to Blackwell falls within *Brady*'s ambit because it was not alleged to have been disclosed until after Reed's trial and therefore may be more properly characterized as newly discovered evidence, we will nevertheless defer to the trial judge's credibility determinations and factfindings because our independent review of the record establishes that they are supported by the record."  (footnote omitted).

The magistrate judge determined that "the Texas courts' conclusions on this claim are consistent with established federal law, and are based on a reasonable determination of the facts in light of the record," and accordingly recommended that the district court defer to those findings. The district court held that there was insufficient evidence "to rebut the presumption of

correctness of the state court's credibility determination," and denied habeas relief.

"As a federal habeas court, 'we must defer to the factual findings in the state court proceedings' and 'respect the ability of the fact-finder to evaluate the credibility of the witnesses.'" *Jackson v. Miss. Dep't of Corr.*, 359 F. App'x 499, 502 (5th Cir. 2010) (citation omitted). Reed fails to offer any reason why the state court's credibility determination as to Blackwell is erroneous. Instead, Reed argues that the district court failed to consider "the State's pattern of suppressing exculpatory evidence" and that the assistant district attorney who allegedly learned of Blackwell's statements had a motive "to deny misconduct and thereby avoid professional or even criminal liability." As with Barnett's testimony, Reed's argument does not strike at the CCA's underlying credibility determination, to which the district court correctly deferred. Reasonable jurists thus would not find the district court's assessment of Reed's *Brady* claim as it relates to Blackwell's testimony debatable or wrong.

4.　　Brenda and Jennifer Praters' statements

Reed argues that the State suppressed the written statements of Brenda and Jennifer Prater. The statements separately describe the Praters seeing Stites the day of the murder. Jennifer stated that she saw two people inside a car behind her house early that morning. She described the person in the driver's seat as "dark complected, but not black" (possibly of "middle eastern descent"), and the person in the passenger seat as a "pale complected" woman with "big hair." Jennifer asserts she was able to get a good look at the individuals because the car's interior light was on. She was certain that Reed was not the man in the car. She subsequently recognized the woman as Stites, after seeing Stites's picture in a newspaper. When confronted by police, however, Jennifer lied dand told police she "didn't know anything about" seeing a car the day of the murder.

No. 13-70009

Brenda stated that early on April 23, 1996, she saw a car go past her house twice. She saw three individuals in the car, the interior lights of which were on—a driver of darker complexion, but not black (possibly "Mexican"); a woman in the passenger seat with light complexion and "big dark hair"; and a white male in the back seat. Like Jennifer, Brenda claims later to have recognized the woman in the passenger seat as Stites from a newspaper article. When police came to speak with her, Brenda related what she saw.

The State argues that Reed's *Brady* claim is procedurally defaulted. It further points out that there was no evidence, other than the Praters' statements, that any police officers actually talked with Brenda and Jennifer Prater. The only notes in the State's possession that possibly related to the statements referred to a "Mary Fisher," and were available to Reed. Finally, the State asserts that even if the statements are taken at face value, they are not material under *Brady*.

Reed's *Brady* claim relating to Brenda and Jennifer Prater was included in his third state habeas petition. The CCA dismissed the claim as an abuse of the writ. The CCA subsequently discussed the Praters' statements in the context of its actual innocence discussion. The CCA questioned the Praters' credibility because they did not come forward with their information until September 2002. Jennifer's credibility was suspect because her husband failed to corroborate her account. The CCA further observed that the Praters' statements had "no continuity with any of the other new evidence offered by Reed and [did] not fit within the chronicle of events that the trial evidence support[ed]." Finding that Reed had failed to establish his actual innocence, the CCA refused to consider the merits of Reed's *Brady* claim as to the Praters' statements.

The district court concluded that the CCA's credibility determination "was unreasonable in light of other record evidence," because Brenda reported

her sighting to the police and because there was no basis for requiring an additional affidavit from Jennifer's husband to find her account credible. Having determined that Reed established cause, the district court assumed actual prejudice to excuse the default. But it proceeded to find that Reed's *Brady* claim failed on the merits. The court reasoned that "[t]here is nothing linking the eyewitness testimony by the Praters to Fennell, and the inferences Reed urges the court to draw from the Praters' statements are far too speculative to have a meaningful impact on a reasonable juror's assessment of the evidence."

We find that the district court's ultimate conclusion to deny habeas relief as to Reed's *Brady* claim is not debatable. Although the district court found that Reed could show cause to excuse procedural default, and assumed resulting prejudice, it appears to us that Reed cannot meet this burden. Considering Jennifer's statement first, Reed has failed to show cause. The CCA found her credibility suspect because she did not come forward with the information until several years after Stites's murder. This is sufficient evidence on which to defer to the CCA's credibility determination under 28 U.S.C. § 2254(e)(1). Jennifer did not approach authorities with the information she held. She also admitted lying to the police because she "knew that being a witness in a criminal investigation would be a hassle." Reed has not disputed these facts. We thus defer to the CCA's credibility determination as to Jennifer and conclude that there was no cause to excuse default because the State did not suppress the statement. We also find that Reed had failed to show prejudice as to the alleged suppression of Jennifer's statement for the same reason we find no prejudice resulting from the purported suppression of Brenda's statement.

As to Brenda's statement, we agree with the district court that Reed has shown cause for excusing default because Brenda testified to having spoken

with police authorities two days after the incident. Reed has not, however, shown actual prejudice, rendering the district court's final disposition of the claim non-debatable. Although Brenda states that she saw Stites with two other men, Reed provides no explanation for who these individuals were. Instead, Reed asserts that the Praters' accounts "fit" with Barnett's testimony because they "likely observed Stites earlier than Barnett did." As he puts it, "[i]f Stites was with other men just prior to her murder, that comports with the Fennell-Stites confrontation witnessed by Barnett and provides motive for Fennell to strangle Stites." Reed's argument fails partly because we defer to the CCA's finding that Barnett's testimony is not credible. Additionally, Brenda's statement is not exculpatory. To the extent there was enough time for an individual to sexually assault Stites after she was seen by the Praters, a reasonable juror could just as easily believe that Reed, and not Fennell, committed the deed. The district court's conclusion that "[i]n light of the other evidence inculpatory of Reed and the lack of credible evidence that Reed had consensual sex with Stites before her death, the Praters' statements . . . do not undermine confidence in the verdict" is not debatable.

5.    Pamela Duncan's affidavit

Reed contends that Fennell's former girlfriend, Pamela Duncan, reported Fennell's abusive behavior to authorities. According to Duncan's affidavit, Fennell was "extremely possessive and jealous," an abusive partner, and hostile toward African-Americans. Reed asserts a *Brady* violation on the basis of the State's suppression of Duncan's statement. The State argues that this claim is procedurally defaulted.

Reed presented his suppression-of-evidence claim concerning Duncan in his fourth state habeas petition. The CCA dismissed the claim as an abuse of the writ, but also considered the substance of Duncan's affidavit as part of its *Schlup* analysis. The CCA concluded that this evidence did not undermine the

jury's verdict.    The district court accepted the magistrate judge's recommendation that this claim be found procedurally defaulted.

The district court's treatment of this *Brady* claim is not debatable.  Reed does not discuss how Duncan's affidavit would have been material at trial, and thus he does not show prejudice to excuse the default.  Likewise, there are substantial questions as to whether Duncan's account actually was suppressed.  The affidavit does not make clear which authorities she approached concerning Fennell's behavior, and there is no other record of her doing so.  It thus appears that Duncan's statements would have been as accessible to Reed as they were to the prosecution. *See Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir. 2002) ("*Brady* does not obligate the State to furnish a defendant with exculpatory evidence that is fully available to the defendant through the exercise of reasonable diligence.").  As we have already concluded that Reed cannot show actual innocence under *Schlup*, Reed's failure to establish cause for defaulting this claim and resulting prejudice renders the district court's denial of habeas relief as to this *Brady* claim not debatable.

6.    Lawsuits against Fennell and the Giddings Police Department

Reed complains that the State suppressed evidence of two lawsuits filed against Fennell and the Giddings Police Department, which alleged violence and lawlessness, including against minorities.  The State contends that information relating to the suits was contained in public documents accessible to Reed.

Reed included this *Brady* claim in his third state habeas petition.  The CCA dismissed it as an abuse of the writ.  The district court found the claim procedurally defaulted.

We find the district court's procedural ruling is not debatable.  We agree with the State that the fact that lawsuits had been filed against Fennell and the Giddings Police Department was public information Reed could have

discovered through reasonable diligence. *See id.* Additionally, Reed spends no time discussing the substance of his claim, and thus he has not shown that he suffered prejudice as a result of it being held procedurally barred.

7.    Fennell's letter to the Giddings city manager

The record contains a letter Fennell wrote to the Giddings city manager in which he states that "[Officer] Hall made several comments during the murder investigation of my fiancé[e].  I have learned to forgive and forget." Reed characterizes this statement as inculpating Fennell in Stites's murder because Fennell also described Officer Hall as being someone who would "burn anyone" to get a position.  Reed states that the State suppressed Fennell's letter.  The State responds that the claim is procedurally defaulted, Reed has not proven the substance of Officer Hall's comments, and the letter was not written until after trial.

Reed's *Brady* claim as it relates to Fennell's letter appeared in his fifth state habeas petition.  The CCA dismissed the claim as an abuse of the writ. The district court accordingly found the claim procedurally defaulted.

Other than his assertion of actual innocence, Reed presents no reasons why the district court should have considered his procedurally defaulted *Brady* claim on the merits.  In any event, a brief review of the letter confirms that Reed's theory is wholly speculative, precluding habeas relief under *Brady*.  *See Moore*, 534 F.3d at 462–63 ("highly speculative theory" insufficient to satisfy *Brady*'s materiality requirement).  There is no cause to debate the district court's procedural dismissal of this claim.

8.    Corruption in the Bastrop Sheriff's Department

Reed argues that "[t]he State's failure to disclose the known corruption within the Bastrop County Sheriff Department deprived Reed of powerful evidence impeaching the credibility of the investigation."  The corruption Reed refers to is the indictment of a former Bastrop county sheriff for several

offenses regarding the improper sale of county property and the wrongful use of labor inmate for personal benefit.  The State dismisses Reed's *Brady* claim as entirely failing to demonstrate how the former sheriff's offenses were favorable to Reed's defense, how this evidence was suppressed, or why it was material.

Reed included his claim that the State suppressed evidence of criminal misconduct by the former Bastrop county sheriff in his fifth state habeas petition.  The CCA dismissed the claim as an abuse of the writ.  The district court found the claim procedurally defaulted, and further found that even if Reed were able to establish cause and prejudice to overcome the state procedural default, his claim would fail on the merits.

Reed's discussion of this *Brady* claim is limited to asserting that the State's failure to disclose the information deprived him of powerful evidence to impeach the credibility of the investigation.  As the State observes, however, Reed has not shown that this information could have been used to impeach anyone who actually participated in the investigation.  We thus conclude that the district court's procedural ruling is not debatable.

F.     Eighth and Fourteenth Amendment violations

Reed alleges that his rights under the Eighth and Fourteenth Amendment were violated when the jury was allowed to consider extraneous criminal allegations relating to a sexual assault committed in 1987, of which he was acquitted.  In Reed's view, the State was allowed during the penalty phase of trial to effectively retry the 1987 case and make closing remarks "designed to inflame and elicit fears in the jury."  The State counters that Reed's argument is unsupported by any Supreme Court precedent, and would run against our own circuit precedent.

Reed raised this claim on direct appeal and in his first state habeas petition.  It was denied on the merits in both proceedings.  The district court

adopted the magistrate judge's recommendation that Reed's constitutional claim be denied based on Supreme Court and circuit precedent. We likewise deny a COA as to this claim.

In *Harris v. Cockrell*, 313 F.3d 238, 245–46 (5th Cir. 2002), this court addressed the question of whether a defendant's right to fair sentencing is compromised "by the introduction of evidence concerning a crime for which he had been indicted but acquitted." The *Harris* court expressly found that "[t]he introduction of evidence of extraneous offenses of which the defendant has been acquitted is consistent with due process," because "[a]lthough due process requires the application of collateral estoppel, that doctrine does not preclude [the State] from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof." *Id.* at 246 (quoting *Dowling v. United States*, 493 U.S. 342, 349 (1990)) (internal quotation marks omitted). The *Harris* court further reasoned that, "[b]ecause 'extraneous offenses offered at the punishment phase of a capital trial need not be proven beyond a reasonable doubt,' the relevant standard of proof necessarily was lower than that at [the defendant's] criminal trial." *Id.* (citation omitted). "Collateral estoppel therefore did not preclude the introduction of evidence pertaining to these charges . . . ." *Id.*

*Harris* is dispositive of Reed's claim, and we conclude that the district court's decision to deny habeas relief on this claim is not debatable.

## IV. Conclusion

For the reasons discussed, we DENY a COA as to all of Reed's claims.