# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

August 14, 2017

Lyle W. Cayce
Clerk

No. 16-70017

DANIEL CLATE ACKER,

> Petitioner - Appellant

v.

LORIE DAVIS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

> Respondent - Appellee

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 4:06-CV-469

Before JOLLY, OWEN, and SOUTHWICK, Circuit Judges.

PER CURIAM:*

Daniel Acker was convicted and sentenced to death in Texas in 2001 for the capital murder of his girlfriend, Marquetta ("Markie") George. He has applied for a certificate of appealability ("COA") to appeal the district court's denial of federal habeas relief. Because he does not make a substantial showing of the denial of a constitutional right, or a showing that his claims are adequate to proceed further, we DENY his request for a COA.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 16-70017

## I. Facts and Procedural History

Acker and George moved into a rented trailer home together in February 2000, shortly after they met.  On the evening of Saturday, March 11, they went to a rodeo and then to a nightclub, "Bustin' Loose."  While at the nightclub, they argued.  Witnesses who were at the nightclub testified at trial that Acker threatened to kill George that night.  Acker was kicked out of the nightclub, but he returned several times, looking for George.

When the nightclub closed at 1:00 a.m., Acker's sister saw him in the parking lot and gave him a ride to his truck, which he had parked up the road from the nightclub.  Earlier that evening, Acker had given George's pocket knife to his sister and he asked her to return it.  When she refused, Acker told her that if he was going to hurt someone he would not need a knife.  He held up an axe and said that if he found George with another man, "they will pay."

Acker continued to look for George the rest of that night.  He believed she was spending the night with another man.  On the morning of March 12, still looking for George, Acker went to his sister's house.  He told his sister that when he found them he was going to beat them and that nobody was going to make a fool out of him.

Around 9:15 a.m. on March 12, Acker went to the home of George's mother, Lila Seawright, still searching for George.  Seawright testified at trial that Acker told her that if he found out George had spent the night with another man, he was going to kill them.  Seawright replied that no one was worth going to the penitentiary for murder.  Seawright testified that Acker shrugged and replied, "Pen life ain't nothing.  Ain't nothing to it."

Later that morning, after Acker had returned to the trailer he shared with George, Robert "Calico" McKee, who worked as a bouncer at Bustin' Loose, brought George to the trailer.  George went inside.  McKee told Acker that he had taken George to her father's home to spend the night.  Acker

2

testified that he did not believe McKee was telling the truth, because he had driven by George's father's house the previous night when he was looking for George. Acker testified that he went into the trailer and confronted George, who admitted that she had spent the night with Calico. When he inquired whether she had slept with Calico, she asked what difference it would make. Acker said that he pushed her down on the couch and shook her, with his hands on her shoulders and his thumbs more or less touching. Acker testified that he asked George where Calico lived and she said she would show him, but instead, she darted out of the trailer.

The neighbors, Mr. and Mrs. Smiddy, testified that George ran out of the trailer, screaming for them to call the sheriff. Acker followed George out of the trailer, grabbed her and threw her over his shoulder, forced her into his pickup truck, and sped away. George was crying and frightened. Mr. Smiddy testified that when George was being pushed into the truck, it was like watching someone try to push a cat into a bathtub. Both Mr. and Mrs. Smiddy testified that after Acker forced George into the truck, they heard a noise that sounded like a loud hit or slap, and did not see George any more after hearing that sound. They testified that as Acker drove away, the truck was swerving all over the road. Mr. Smiddy went inside and called the sheriff.

Brodie Young testified that on the morning of March 12, he was driving past a dairy farm on a county road when he saw a truck on the side of the road. As he passed the truck, he saw a man sitting in the driver's seat of the truck. The man looked "peculiar" and seemed to be talking to himself. After Young passed the truck, he looked at his side mirror and saw a man get out of the truck on the driver's side, rush around the front of the truck, open the passenger's door, and pull a woman out of the truck. The man had his arms under the woman's arms and took three or four steps backward after he pulled her out of the truck, then laid her on the side of the road, got back in the truck,

No. 16-70017

and drove away. Young drove to the sheriff's office to report what he had seen. On cross-examination, Young admitted that he had exaggerated when he initially told law enforcement officers that he had seen a man and woman fighting in the truck.

Sedill Ferrell, who owned the dairy farm, found George's body and contacted the sheriff's office. Acker turned himself in to a law enforcement officer and was arrested soon thereafter. George's body was found less than two and one-half miles from the trailer where she had lived with Acker.

The medical examiner, Dr. Gonsoulin, testified at trial that George had extensive injuries, including blunt force injuries to all parts of her body, particularly her head and neck. Her heart and lungs were lacerated, and her liver was pulpified. There was a large, deep laceration on her leg. The bones in her face were broken, her skull was shattered in all areas, and her head was crushed, consistent with being struck with some type of blunt instrument. The injuries on the neck indicated that a significant amount of pressure was applied around the neck and that it occurred while George was alive. The parchment-like abrasions seen on external examination were consistent with the kind of blunt force injuries sustained in motor vehicle accidents or accidents where people fall out of cars. The injuries to the neck were not consistent with falling or being hit, but were from constriction rather than blunt force received from falling from a vehicle. The neck injuries were consistent with strangulation. The blunt force injuries in and of themselves were sufficient to cause death, and so was the strangulation. It was her opinion that the cause of death was strangulation, either manual or ligature, or possibly both, as well as blunt force injury resulting from George being caused to impact a blunt object. Dr. Gonsoulin could not determine whether strangulation or blunt force caused George's death.

4

No. 16-70017

On cross-examination, Dr. Gonsoulin testified that it was possible George's neck injuries could have occurred forty-five minutes to an hour prior to her death. She also testified that George had road rash, consistent with jumping out of the vehicle and striking the ground. She testified that a downward force on the head can cause fracturing in the skull and with sufficient force, fracture the atlas. George had a pons medullary rent, meaning that her brain stem and medulla were torn where the base of her skull was crushed. Dr. Gonsoulin explained that death occurs instantaneously when the pons medulla is torn. She testified that George had a lot of injuries that would have killed her regardless of any strangulation, independent of it.

Acker's counsel asked Dr. Gonsoulin the following question: "If someone falls from a vehicle going 40 miles per hour and breaks or tears the medulla oblongata there's going to be instantaneous death, isn't that right?" The trial court sustained the prosecution's objection that the question assumed facts not in evidence (fall from vehicle, vehicle traveling forty miles per hour).

The first witness called by Acker was Sabrina Ball. The prosecutor requested a bench conference in which he objected on hearsay grounds to Ball's proposed testimony that George had told Ball that she tried to jump from Acker's truck two weeks before her death. Outside the presence of the jury, Ball described the events of the night of February 26, 2000, as follows: George rang her doorbell and knocked on the door. George was down on her hands and knees in the front yard, crying and saying, "help me, help me." George was hysterical, very upset, very shaky. Ball brought her inside and asked her if she had been hurt and what was wrong. George said that Acker was going to kill her, and that he was crazy. George called the sheriff's department. When Ball asked George what had happened, George said that she and Acker had been at Bustin' Loose and that a fight had started. They left the club and were driving to Acker's mother's house. Acker took her head and tried to beat

it against the dash and she tried to jump out of the truck, but he grabbed her by the hair of the head and dragged her back in. She said that her face was inches from the pavement.

On cross-examination by the prosecution, still outside the presence of the jury, Ball testified that George told her that the fight continued after they got to Acker's mother's home. Acker picked his mother up and threw her on the couch and ran off after breaking out a window.

Defense counsel argued that Ball's testimony was admissible under the excited utterance and present sense impression exceptions to the hearsay rule. The trial court ruled that it would allow as an excited utterance only George's statement, "help me, help me, he's crazy, he's going to kill me," and not the testimony about George's statement that she had tried to jump out of Acker's truck.

Next, Acker called Hopkins County Deputy Sheriff Anderson, who testified outside the presence of the jury about his involvement in the events of February 26. He responded to the call at Sabrina Ball's home and spoke to George, who appeared to be upset. George told him that she and Acker had gotten into an argument at Bustin' Loose and that she tried to jump out of his truck while they were driving to Acker's mother's residence, but that Acker grabbed her by the arm to keep her from getting out. On cross-examination, he testified that she told him that Acker picked his mother up and threw her on the couch and then ran through the sliding glass window at the back of the house to get away.

Defense counsel told the court they had also issued a subpoena for Lewis Tatum, whose testimony would be substantially the same as Anderson's.

Acker's mother, Nancy, testified outside the presence of the jury that she saw Acker shortly before noon on March 12 and he told her that George had

jumped out of his truck and was dead. The trial court ruled that her testimony was not admissible under the excited utterance exception to the hearsay rule.

With the jury present, Mrs. Acker testified that she saw Acker on March 12, shortly before noon. He was very emotional and stressed. He was not wearing a shirt and his jeans were streaked from the knees down with a liquid substance that appeared to be blood.

Next, Acker called as a witness defense investigator John Riley Sands, from whom he sought to elicit testimony, regarding the distance from George and Acker's home to the location where her body was found and the time it took him to drive that distance. The trial court ruled that it would not allow Sands to testify as to the time it would take to drive from the mobile home to the crime scene because it would require assuming facts not in evidence, i.e., the speed that Acker was driving. Outside the presence of the jury, Sands testified that he had performed an experiment with a truck similar to the one Acker was driving on the day of George's death. He was not able to reach from the driver's seat to the passenger's side of the truck and open the door without extending himself quite a bit, resulting in him being unable to see above the dashboard. He did not think he would have been able to open the passenger's door and push someone out of the vehicle while driving. The prosecution objected and pointed out that the defense had an accident reconstruction expert appointed and that expert observed the vehicle Acker drove on March 12 and could have tested it if he had chosen to do so. The trial court sustained the prosecutor's objection.

Although he had previously said that he did not want to testify, Acker told the court that he had reconsidered. He testified that he carried George to his truck, but denied kidnaping her. He denied that he hit her and denied hearing a loud noise. He testified that when he began to drive away from the trailer, George opened the door and attempted to jump out of the truck, but he

reached over and caught her by her jacket and her hair and pulled her back into the truck. He said that as he reached over to stop George from jumping out, his knee hit the steering wheel and the truck went into the ditch. He overcorrected and went into the ditch on the opposite side of the road and started fishtailing. He slapped George because she attempted to jump from the truck a second time. When a car approached on the one-lane road, he said that George succeeded in jumping from the truck. He said that he backed up as fast as he could and picked George up, intending to put her in his truck. However, there were some light bulbs on the seat, so he put her down so that he could move them. When he picked her up again, he realized that she was dead, panicked, went into shock, and left. He testified that he went to his place of employment to use the telephone, and his mother pulled up beside him. He told her George had jumped out of the truck and was dead. He went to his sister's house, but his sister was not there. Then he went to his mother's house. Next, he went to Kenny Baxter's house, and then returned to his mother's house. He explained that he did not report the incident to the authorities immediately because he was scared, looking for somebody to comfort him, and feared being charged with driving while intoxicated. On cross-examination, he admitted that he packed some clothing when he was at his mother's house, and that he had thought about fleeing. On his way to Kenny Baxter's house, he hid the bag of clothes behind a tree.

The trial court sustained the prosecutor's objection to Acker testifying about George trying to jump out of the truck two weeks earlier, on February 26.

The indictment charged Acker with kidnaping George and murdering her by strangulation, blunt-force injury, or a combination of the two. The trial court instructed the jury on the theory that Acker killed George by strangulation and/or the use of blunt force. The trial court denied Acker's

requests for jury instructions on attempted kidnapping, unlawful restraint, manslaughter, and criminally negligent homicide. It also denied his request for an instruction that the jury must acquit if it found that George jumped from a moving vehicle or had a reasonable doubt about it. The jury found Acker guilty of capital murder and answered the special issues in a manner that resulted in imposition of the death penalty.

The Texas Court of Criminal Appeals (TCCA) affirmed Acker's conviction and sentence on direct appeal. *Acker v. State*, No. AP-74,109, 2003 WL 22855434 (Tex. Crim. App. Nov. 26, 2003).

Acker, represented by court-appointed counsel, filed an application for state post-conviction relief, raising forty-six claims of error. The trial court conducted an evidentiary hearing on those claims. Acker also filed a pro se state habeas application. The TCCA denied relief on the initial application filed by counsel and dismissed Acker's pro se petition on procedural grounds. *Ex parte Acker*, Nos. WR-56,841-01 and WR-56,841-03, 2006 WL 3308712 (Tex. Crim. App. Nov. 15, 2006).

Acker filed his federal habeas petition in November 2007. It included claims that Acker had not raised in state court. At Acker's request, the district court held the federal proceedings in abeyance while Acker's subsequent state habeas application was pending. After the TCCA dismissed Acker's subsequent application as an abuse of the writ, Acker returned to federal court.

In June 2011, the district court (Judge Schell) conducted an evidentiary hearing on Acker's actual innocence claim. At that hearing, the new medical experts for both Acker and the State agreed that George's injuries were inconsistent with strangulation, and that she died from blunt-force injuries. The State's expert, Dr. Di Maio, testified that it was his opinion that George had been run over by a vehicle, because her injuries ("squashed" head, shredded brain, crushed chest, blown-out heart, internal-organ lacerations,

No. 16-70017

and muscle tears) were too extensive to have been caused by jumping from or being pushed out of a truck. Acker's expert, Dr. Larkin, suffered a heart attack and was not able to testify at the hearing, so his report was admitted into evidence. Dr. Larkin believed that George likely jumped from Acker's truck. Acker stipulated that if questioned, Dr. Larkin would concede that it is possible that George was run over and that, from the medical evidence alone, it is impossible to say whether George jumped or was pushed from the vehicle.

Acker presented evidence of George's attempts to jump from his truck while he was driving it, both on the day of her death and a couple of weeks earlier, including the evidence that the trial court had excluded. His mother testified that on the day of George's death, before Acker turned himself in to the authorities, Acker told her that George had jumped out of the truck and was dead. Mrs. Acker had heard that George had previously attempted to jump from a vehicle.

Sabrina Ball testified, as she did outside the presence of the jury at trial, about the events of February 26, when George told Ball that she had tried to jump out of Acker's truck but that Acker had grabbed her hair and pulled her back in. Ball's testimony was corroborated by her written statement, in which she stated that George told her, "I tried to jump out but he pulled me back in. My face was just a few inches from the pavement."

Lewis Tatum of the Hopkins County Sheriff's Office testified at the evidentiary hearing that on February 26, 2000, about two weeks before George's death, he took a statement from George. He testified that his report states that George told him she and Acker had gotten into a fight on the way home from a nightclub and that she had tried to jump out of the truck while Acker was driving, but that Acker caught her by the arm and pulled her back into the vehicle. The parties stipulated that Hopkins County Deputy Sheriff

10

No. 16-70017

Anderson would also testify that George reported that she had attempted to jump from Acker's truck two weeks prior to her death.

Acker offered a stipulation that Walter Allen Story, the 911 communications supervisor for the Hopkins County Sheriff's Office, would have testified that the 911 radio log on March 12, 2000, recorded: a call from Mr. Smiddy at 11:45 a.m.; a call from Mr. Ferrell at 11:47 a.m; Officer Hill's arrival at the location of George's body at 11:51 a.m.; and Officer Hill's call to say there was no pulse at 11:53 a.m. Acker also presented a stipulation that Bill Reece of the Hopkins County Sheriff's Office would have testified that he interviewed Acker after Acker waved him down and surrendered.

John Riley Sands, the defense investigator at the 2001 trial, testified at the federal hearing that he drove the distance from Acker's residence to the crime scene, and it took about three to five minutes, a distance of a little over two miles. He also obtained a truck similar to the one Acker drove on the date of George's death. The interior of the truck was wider than a conventional sedan. He sat in the driver's seat and was unable to reach the passenger's door while still being able to see the road and drive. He testified that it would have been difficult to open the door and push someone out of the truck. The experiment was performed without anyone in the passenger seat. The presence of another person in the truck would have made opening the door more difficult, especially if that person were resisting. On cross-examination, Sands testified that the purpose of the experiment was to show that it was not possible for Acker to reach across and open the door while he was driving. He acknowledged that Acker was "a little bit" taller and perhaps could have reached farther. He also agreed that other variables, including arm length, torso and leg length, would affect the value of the experiment.

Acker presented a stipulation that Deputy Sheriff Chris Hill's report states that Mr. Smiddy told the 911 operator that Acker forced George into the

truck and, while Acker was driving away, George tried to exit the vehicle, but Acker jerked her back in.  Acker also offered a stipulation that Alicia Smiddy's statement to the Hopkins County Sheriff's Office stated:  George came running out of their house yelling for the Smiddys to call the Sheriff.  Acker came charging out of the house with no shirt, with an evil, mad look on his face.  Acker picked George up over his shoulder.  George was screaming, kicking, yelling, and trying to get loose.  Acker shoved George into the truck on the driver's side.  George was trying to get out, but Acker hit her, and shoved her on in.  Holding her down, he spun off through the ditch, swerving all over the road.

Tony Hurley of the Hopkins County Sheriff's Office was called as a witness by the State.  He testified that he performed an investigation on a similar truck, a 1999 Ford F350 one-ton, with a bench seat.  From window to window, the truck measured six feet and one-half inch; from door handle to door handle was sixty-seven inches, and from the center of the steering wheel to the passenger-side door latch was fifty-two inches.  Hurley was two inches shorter than Acker and he was able to lean over and open the passenger door.  Hurley testified that he interviewed Acker after he was arrested.  Acker told Hurley that George was trying to get out of the truck while he was driving and he pulled her hair to hold her in the truck.  He also hit her in the nose and mouth.  When Hurley told Acker what the medical examiner had said about strangulation, Acker got angry, said that the medical examiner was lying, and continually stated that George jumped out of the truck.  Hurley said that Acker told him that he felt responsible for George's death, because he had abducted her, but he did not intend her death.

Following the evidentiary hearing in June 2011, Judge Schell took senior status in 2015.  The case was transferred from Judge Schell to Judge Crone in

No. 16-70017

May 2016.  About five weeks later, in a 108-page opinion, she denied relief and denied a COA.  Acker timely appealed and now requests a COA from this court.

## II.  Issues Presented

Acker requests a COA for four claims:

(1) He is actually innocent.

(2) His due process rights were violated when his conviction and death sentence were upheld based on false evidence, a now-discredited theory, and a new theory never presented to his jury.

(3) The trial court erroneously excluded evidence of his actual innocence and the district court incorrectly held some of these claims to be procedurally barred.

(4) His state habeas counsel rendered ineffective assistance amounting to fraud on the court.

In order to obtain a COA, Acker must make a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  He must show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citation omitted).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward:  The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  With respect to claims dismissed on procedural grounds, the petitioner must show both "[1] that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and [2] that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Id.*

13

No. 16-70017

When "reviewing [a] request for a COA, we only conduct a threshold inquiry into the merits of the claims [the petitioner] raise[s] in his underlying habeas petition." *Reed v. Stephens*, 739 F.3d 753, 764 (5th Cir. 2014) (citing *Miller-El*, 537 U.S. at 336). This "threshold inquiry" is not a "full consideration of the factual or legal bases adduced in support of the claims," but rather "an overview of the claims in the habeas petition and a general assessment of their merits." *Miller-El*, 537 U.S. at 336; *see also Buck v. Davis*, 137 S. Ct. 759, 774 (2017). In generally assessing the claims for relief in a COA application, "[t]he question is the debatability of the underlying constitutional claim, not the resolution of that debate." *Miller-El*, 537 U.S. at 342. And "in a death penalty case, 'any doubts as to whether a COA should issue must be resolved in [the petitioner's] favor.'" *Ramirez v. Dretke*, 398 F.3d 691, 694 (5th Cir. 2005) (alteration in original) (quoting *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000)).

## A. Actual Innocence and Due Process

Acker requests a COA for his claim that he is actually innocent and therefore the district court should have considered the merits of his procedurally barred claims. He also requests a COA for his claim that the prosecution's reliance on strangulation as the cause of death undermined the fairness of his trial and violated his due process rights. Acker's brief discusses his actual innocence and due process claims together, because he contends that both claims are based on the new evidence that George was not strangled.

A federal habeas court cannot consider procedurally defaulted claims unless the petitioner makes a showing of cause and prejudice to excuse the default or can demonstrate that he is actually innocent. *House v. Bell*, 547 U.S. 518, 536 (2006). Acker's claim of actual innocence is not an independent constitutional claim "but instead a gateway through which [he] must pass to have his otherwise barred constitutional claim[s] considered on the merits.

14

*Schlup v. Delo*, 513 U.S. 298, 315 (1995) (citations and internal marks omitted). Successful gateway claims of actual innocence are "extremely rare," and relief is available only in the "extraordinary case" where there was "manifest injustice." *Id*. 324, 327. When considering a gateway claim of actual innocence, the district court must consider all of the evidence, "old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House*, 547 U.S. at 538 (internal quotation marks and citations omitted). "Based on this total record, the court must make 'a probabilistic determination about what reasonable, properly instructed jurors would do.'" *Id*. (quoting *Schlup*, 513 U.S. at 329). "The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *Id*.

Acker's burden of proof "at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." *Id*. It is not enough for Acker to show "that a reasonable doubt exists in the light of the new evidence." *Schlup*, 513 U.S. at 329. Instead, he must show "that no reasonable juror would have found [him] guilty." *Id*.

The indictment alleged that Acker murdered George by "manual strangulation and ligature strangulation with an object, the exact nature of which is unknown to the grand jury, and blunt force injury resulting from causing her to impact a blunt object." The State's theory at trial, supported by the medical examiner's testimony, was that George was strangled and thereafter suffered blunt-force injuries, and that it was not possible to determine whether strangulation or blunt-force injuries caused her death.

The defense theory at trial was that George's death was caused by injuries she sustained when she jumped from Acker's truck while he was driving.  In their opening statement, Acker's trial counsel told the jury that on previous occasions George had tried to jump from the truck when Acker was driving it, but had been pulled back by him, and that she succeeded in jumping from the truck on the day of her death.  As we have indicated earlier, however, the trial court held that evidence about George's previous attempt to jump from Acker's truck was inadmissible. The trial court also sustained the prosecution's objection to defense investigator Sands's testimony about the difficulty of opening the passenger door of a similar truck while driving.

At the federal evidentiary hearing, Acker presented the evidence that the trial court had excluded, regarding George's previous attempt to jump from Acker's truck.  In addition, both parties and their medical experts agreed that George was not strangled and that strangulation was not the cause of her death.  Both experts agreed that George died as the result of blunt force injuries, but they did not agree on the nature of those injuries or what caused them:  it was the opinion of the State's expert that the injuries were caused by the truck running over George, while it was the opinion of Acker's expert that the injuries likely resulted when George jumped from the truck, and that there was no credible evidence that George was run over.  Acker stipulated, however, that if asked, his expert would testify that it was possible that George had been run over.

After reviewing the indictment and jury instructions, the district court found that the jury could have convicted Acker based on a theory of strangulation, a theory of blunt-force injury, or a combination of the two.  The court rejected Acker's contention that the court was bound to consider only the prosecution's primary theory as to the cause of death, strangulation, when making its probabilistic determination on Acker's actual innocence claim.  The

district court observed that although the prosecution referred to strangulation in closing argument, the same argument could easily apply to running over George, regardless of whether she had been strangled. After analyzing all of the evidence presented at trial and the evidentiary hearing, including the evidence that Acker claimed the trial court erroneously excluded, the district court concluded that "the totality of the evidence, if presented to a reasonable jury, overwhelmingly supports the strong inference that Ms. George was unconscious or incapacitated when Mr. Young saw Petitioner pull her from the truck and lay her along the road in front of that truck, that Petitioner subsequently ran over Ms. George with his truck, and that event was the cause of her death."

Acker contends that his death sentence cannot be upheld on the basis of two new and incompatible theories never presented to his jury: that he either pushed George out of the truck, or laid her on the roadside and ran over her. He also argues that the district court's new theory is incompatible with the way the parties framed the question at the evidentiary hearing: whether George was pushed or jumped from the truck.

Based on our overview of Acker's actual innocence claim and general assessment of its merits, we conclude that reasonable jurists could not debate the district court's decision that the totality of the evidence, including the new medical expert testimony and the evidence that the trial court excluded, supports the conclusion that Acker murdered George on a theory with which he was charged in the indictment and on which his jury was instructed. Nor would reasonable jurists debate the district court's conclusion that Acker failed to carry his burden of demonstrating "that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt." *House*, 547 U.S. at 538.

It is true that the State's theory at trial was largely based on strangulation as the cause of George's death.  As the district court noted, however, the State presented evidence and argument that George may have died from blunt force trauma and the indictment and jury instructions presented the jury with the theory that George's death was caused by blunt force trauma.  Nevertheless, the district court was not limited to considering only the evidence presented at trial, or only the prosecution's primary theory at trial, when making its probabilistic determination of what reasonable, properly instructed jurors would do.

Reasonable jurists could not debate the district court's conclusion that the fact that the medical experts for both parties in the federal habeas proceedings disagreed with Dr. Gonsoulin's conclusion that George had been strangled does not, as Acker contends, make it much more likely that George jumped from the truck.

The evidence that George attempted to jump from Acker's truck on February 26, 2000, two weeks prior to her death, tends to show that she had a propensity to jump out of a moving vehicle, as Acker argues.  That evidence was excluded by the trial court on hearsay grounds, but it nevertheless must be considered in evaluating his actual innocence claim.  *See id.*  Contrary to Acker's assertion, the district court did not ignore that evidence.

Acker correctly points out that he has consistently maintained, to his mother on the morning of March 12 and to law enforcement authorities when questioned after his arrest, as well as at trial and throughout the post-conviction proceedings, that George jumped from the truck.  However, it does not strain credulity to think that a reasonable, properly instructed juror might conclude that he lied to protect himself.

As Acker notes, the Smiddys' trial testimony is not entirely consistent with their initial statements to the police in which both of them said that

George was trying to jump out of the truck as Acker was driving away from the trailer. At trial, Mr. Smiddy testified that he did not recall whether he told the dispatcher about George trying to get out of the truck. Mrs. Smiddy testified at trial that she just assumed that George was trying to get out because she could see Acker leaning toward the middle of the truck and swerving all over the road. Furthermore, Mr. Smiddy's statement does not include that he heard a noise that sounded like someone being hit and then did not see George in the truck, as he testified at trial. Nevertheless, evidence that the Smiddys saw George trying to get out of the truck as Acker drove away from the trailer would not *require* a reasonable juror to have a reasonable doubt as to whether George jumped from the truck after it had traveled over two miles from the trailer.

Even if it were unreasonable to credit the possibility that Acker pushed a resisting George out of the truck, one-handed, while driving, and even assuming that the trial court erred by excluding the testimony of defense investigator Sands about the difficulty of opening the passenger door while driving, reasonable jurists could not debate the district court's conclusion that this does not satisfy Acker's burden on his gateway claim of actual innocence. Contrary to Acker's assertion, there is some evidence that George may have been unconscious or incapacitated. The Smiddys testified that after Acker forced George into the truck, they heard a noise that sounded like a hit or slap and then did not see George again. Brodie Young testified that he saw Acker's truck stopped on the side of the road and saw Acker pull a woman from the passenger side of the truck and place her on the roadside. Thus, even though George may have been alive and resisting when the Smiddys watched the truck drive away, swerving all over the road, this does not mean that George was still conscious and resisting at the time she exited Acker's truck more than two miles away from where the Smiddys saw her.

19

Acker's argument that there is no evidence that he had a motive to kill George, and instead intended only to force her to show him where Calico lived, ignores the evidence of his numerous threats to kill George, which he made the night before and the day of her death.  He attempts to minimize those threats by claiming that he was drinking heavily and likely intoxicated when he made them, and claims that if it had been his intention to kill George, he would have done so in the trailer when she first told him she had spent the night with Calico.  Reasonable jurists could not debate the district court's decision that these self-serving arguments, considered in the light of the new evidence that George was not strangled, as well as the excluded evidence of George's previous attempts to jump from Acker's truck while he was driving, are inadequate to satisfy Acker's burden of showing that it is more likely than not that any reasonable juror would have had a reasonable doubt about his guilt.

The fact that Acker turned himself in to the authorities weighs in his favor.  However, he waited to do so and in the interim between leaving George's body on the side of the road and flagging down the officer to turn himself in, he went to his place of employment, his sister's home, a friend's home, and his mother's home, and even packed some clothing, with the idea of fleeing.

Acker now concedes that there is a possibility that George was run over, but claims that this possibility is not inconsistent with her jumping nor with his prior testimony, because he has never denied that George might have been run over.  He relies on the report of his federal habeas expert, Dr. Larkin, who explained that George might have hit the truck's protruding utility bed when she jumped, which could have caused her to be run over.  However, as the district court correctly noted, Acker testified at trial:  "I did not run over her when I backed up or when I drove away." Accordingly, his contention that he has never denied that George might have been run over is contradicted by the record.

No. 16-70017

The theory that Acker deliberately ran over George with his truck is neither new nor fanciful. In his opening argument, the prosecutor stated, "They cannot tell you that she was alive or dead at a particular time when she was run over." Acker's defense counsel did not concede at trial that George might have been run over after she jumped out of the truck, and counsel testified at the state habeas hearing that he did not call the defense accident reconstruction expert, A. L. Pipkin, to testify at trial because Pipkin had concluded that the "front tire ran over the lady's head." In closing argument, the prosecutor said: "The struggle's over when that loud hit occurred because she's never seen again. . . . Somewhere on the road he realized he'd killed her, so he dumps the body, runs over it to make it look like she jumped out, and then flees."

Nor could reasonable jurists debate the district court's rejection of Acker's contention that there is no evidence that supports an inference that he ran over George after she had exited the truck. The Smiddys testified that after Acker forced George into his truck, they heard a loud noise that sounded like a hit and then did not see George again. Brodie Young testified that he saw a man take a woman's limp body from the passenger side of the truck and place it on the side of the road.[1] The nature of the injuries that George sustained, including multiple skull fractures, a shredded brain, compression of the chest that caused two chambers of her heart to be "blown out," as well as injuries to her lungs and liver, also supports an inference that she was run over. With respect to Acker's claim that the presence of road rash on George's body proves that she jumped from the truck, Dr. Di Maio testified: "It is possible she was run over and dragged a short distance and didn't jump or get

[1] Acker attacks the credibility of Young's testimony on the basis of Young's giving inconsistent statements to the authorities, yet he relies on Young's testimony that the truck did not run over the woman.

21

pushed from the truck. She's got brush abrasions, road rash, on part of her. All I can say definitely, 100%, is that she was run over." Dr. Di Maio testified that if a person jumped or was pushed from a moving vehicle, "you typically get a little head injury, commonly a broken neck, but you go tumbling. If a person goes out, they tumble, and so they generally tend not to get too many injuries below the neck."

Acker argues that the district court ignored the due process component of his innocence claim. He contends that the medical examiner's testimony that George had been strangled, and the prosecution's reliance on strangulation, undermined the fairness of his trial and violated his due process rights. He contends further that the TCCA violated his due process rights when it upheld his conviction based on a theory that was not submitted to the jury (the theory that he deliberately ran over George after placing her body on the side of the road). Acker asserts that because due process is primarily concerned with the fairness and accuracy of the result, and because the State was responsible for the error, the standard for materiality is low: all that matters is whether the false testimony contributed to the conviction.

The district court considered the discrediting of the strangulation theory in making its assessment of Acker's actual innocence gateway claim. Because reasonable jurists could not debate the district court's decision that Acker failed to show actual innocence, consideration of his procedurally defaulted due process claim is not necessary. In any event, the federal habeas experts' disagreement with Dr. Gonsoulin's testimony that George was strangled does not mean that her testimony was necessarily "false."

Because the district court's denial of Acker's actual innocence and due process claims is not debatable, we deny Acker's request for a COA for these claims.

No. 16-70017

## B. Trial Errors

Acker requests a COA for his claim that the trial court's erroneous evidentiary rulings deprived him of his due process right to a fair trial because they kept the jury from hearing that George had attempted to jump from his truck two weeks prior to her death, and also from hearing testimony that George was attempting to escape from the truck just a few minutes prior to the discovery of her body. He also requests a COA for his claim that the trial court erred by failing to instruct the jury on certain lesser included offenses.

In Claim II(d), Acker complains that the trial court did not allow him to ask the medical examiner, Dr. Gonsoulin, a hypothetical question regarding whether instantaneous death would result if a person jumped from a vehicle traveling at a speed of forty miles per hour and broke or tore the medulla oblongata (brain stem). The trial court sustained the objection on the ground that the question was not based on the evidence. Acker argues that the question was proper because it was based on a reasonable conjecture about the evidence that had been presented through the medical examiner and that he was prejudiced because this was the defense theory of the case.

In Claim II(e), Acker complains that the trial court erred by disallowing evidence that George had previously tried to jump from the truck while Acker was driving. Specifically, he complains about the exclusion of Sabrina Ball's testimony that on February 26, two weeks prior to George's death, George had told Ball that George had tried to jump from the truck in circumstances similar to those on the day of her death. Acker argues that the trial court erroneously bifurcated the conversation between George and Ball into "excited" and "non excited" portions when it ruled that the evidence did not satisfy the excited utterance exception to the hearsay rule. In addition, Acker argues that the trial court erroneously excluded the testimony of Hopkins County Deputy Sheriffs William Brandon Anderson and Lewis Tatum regarding George's

23

statement that she had attempted to jump out of the truck on February 26. Acker contends that the exclusion of this testimony on hearsay grounds was clearly erroneous, because George was no longer available, her utterances were excited and spontaneous, and they would have established prior consistent conduct.  Finally, he contends that the trial court erred by excluding the testimony of defense investigator Sands regarding tests that he conducted which showed that Acker could not have pushed George out of the truck.  Acker notes that defense counsel's requests for forensic experts were denied on the grounds that the defense had been given an investigator but, when the investigator attempted to show that Acker could not have pushed George out, the trial court ruled it inadmissible because the investigator's tests were not performed by experts, for which the court had denied funding.  Acker contends that the trial court erred, because no special level of expertise was required for the tests and because the prosecution had previously stipulated that Sands was a crime scene expert.  Acker asserts that he raised this claim on direct appeal, but the TCCA rejected it on the ground that any error was harmless because the State's theory of the case was that Acker strangled the victim and the extensiveness of her blunt force injuries suggests that she did not incur them by falling or being pushed out of a moving truck, but instead was run over by the truck.

In Claim II(l), Acker contends that the trial court erred by instructing the jury at the guilt phase that conduct is not rendered involuntary merely because the person did not intend the results of his conduct, because that instruction conflicted with the definition of intentional acts and the instruction about acting intentionally.

In Claim II(m), Acker contends that the trial court erred in refusing the defense request for instructions on the lesser included offenses of kidnaping, unlawful restraint, manslaughter, and criminally negligent homicide.  Acker

maintains that he raised this claim on direct appeal and the TCCA assumed it was error to deny the requested instructions but found the error harmless, largely based on the now-discredited evidence of strangulation. Acker contends that the error can no longer be considered harmless in the light of the State's concession that George was not strangled.

The district court found these claims to be procedurally barred and did not reach the merits of them because Acker's gateway claim of innocence failed.

Acker contends that jurists of reason would find it debatable whether the district court was correct in its holding that Claims II(d), II(e), II(l) and II(m) were procedurally barred and in its assessment of the constitutional merits of those claims. Acker contends that Claims II(e) and II(m) are not procedurally barred because they were brought on direct appeal. For the other two claims, II(d) and II(l), he asserts cause based on the "false" testimony of Dr. Gonsoulin regarding strangulation and prejudice based on the harm he suffered as a result of that testimony.

Reasonable jurists could not debate the district court's decision that these claims are procedurally defaulted, that Acker has not shown cause and prejudice that would excuse the default, and that he cannot use actual innocence as a gateway to consideration of the merits of these claims. The claims were raised for the first time in Acker's third state habeas application, which was denied as an abuse of the writ. Although Acker asserts that he raised Claims II(e) and (m) on direct appeal, he alleged only state law violations, not federal constitutional violations. Accordingly, we deny a COA for these claims of trial error.

C.  Ineffective Assistance of State Post-Conviction Counsel

Finally, Acker requests a COA for his claim that he was denied due process and the right to effective assistance of counsel by the appointment of ineffective state post-conviction counsel.  He asserts that his post-conviction counsel filed a state habeas application that consisted of Acker's memos and letters, submitted verbatim and without even basic editing.  As a result, the state habeas petition was incoherent and was the subject of widespread media attention.  Acker claims that he was prejudiced by post-conviction counsel's failure to competently investigate or present evidence of actual innocence and the trial court errors discussed above.

Acker acknowledges that *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), apply only to ineffective assistance of trial counsel claims, but he contends that his claim is outside the *Martinez-Trevino* exception because his state post-conviction counsel committed a fraud on the court by presenting a state habeas application consisting of Acker's own work, fraudulently represented as his counsel's.

Reasonable jurists could not debate the district court's decision that Acker cannot excuse the procedural default of his claims by asserting the ineffectiveness of state habeas counsel in the absence of any claims of ineffective assistance of trial counsel; that he is not entitled to federal habeas relief based on a standalone claim of ineffective assistance of state habeas counsel; and that he cannot prevail by arguing that his state habeas application was a fraud on the court.  We therefore deny a COA for this claim.

III.

Acker has not made a substantial showing of the denial of a constitutional right, or a showing that his claims are adequate to proceed further.  We therefore DENY his request for a COA to appeal the district court's denial of federal habeas relief.